# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Thomas Kurpiewski,            :
          Petitioner       :
     :
       v.            :    No. 158 C.D. 2018
     :
Workers' Compensation Appeal     :
Board (Caretti, Inc.),          :
          Respondent    :
     :
Caretti, Inc.,             :
          Petitioner       :
     :
       v.            :    No. 194 C.D. 2018
     :    Submitted: September 28, 2018
Workers' Compensation Appeal     :
Board (Kurpiewski),          :
          Respondent    :


BEFORE:     **HONORABLE MARY HANNAH LEAVITT,** President Judge
              **HONORABLE RENÉE COHN JUBELIRER,** Judge
              **HONORABLE ELLEN CEISLER,** Judge


**OPINION BY**
**JUDGE COHN JUBELIRER**                **FILED: January 18, 2019**


     Presently before the Court are the cross-petitions for review from the Order of the Workers' Compensation Appeal Board (Board) filed by Thomas Kurpiewski (Claimant) and Caretti, Inc. (Employer).[1] Claimant petitions for review of the Board's Order that, in relevant part, modified a Workers' Compensation Judge's (WCJ) decision awarding Claimant ongoing workers' compensation (WC) benefits to reflect an award of benefits for a closed period between June 21, 2012, and

---

[1] The petitions for review were consolidated by this Court.

August 14, 2012, and directed the recalculation of Claimant's average weekly wage (AWW). Employer petitions for review of the Board's Order, which reversed the WCJ's decision denying Claimant's Penalty Petition and awarded Claimant a 10-percent penalty.

## I. Background

### A. *Proceedings before the WCJ*

Claimant, a union bricklayer, worked for Employer on various job sites, most recently in the Spring of 2012. In April 2012, while working for Employer, Claimant broke out into a rash on various parts of his body. He left work on April 16, 2012, and did not return at the instruction of his physician, Joel Laury, M.D. Dr. Laury diagnosed Claimant with allergic contact dermatitis arising from Claimant's long-term work exposure to chromium, which is found in bricks, concrete, and mortar. On June 21, 2012, Claimant filed a Claim Petition and a Penalty Petition, alleging, respectively, that he suffered the above injury and that Employer violated the WC Act[2] (Act) by not timely accepting or denying liability for that injury. In addition to ongoing WC benefits and a penalty, Claimant sought attorneys' fees, alleging Employer's contest became unreasonable following a November 6, 2012 Independent Medical Examination (IME) that indicated Claimant's condition was work-related and he could not return to his position as a bricklayer. Employer filed answers denying the material allegations in the Petitions.

The Petitions were consolidated, and the WCJ held hearings, at which Claimant testified as follows. Claimant began working as a bricklayer when he left

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1 - 1041.4, 2501-2708.

2

high school, approximately 18 years prior to the December 4, 2012 hearing. (Reproduced Record (R.R.) at 21a.) Thus, he has worked as a bricklayer since approximately 1994. Claimant first experienced a rash in 2007 while working as a bricklayer for a different employer. Claimant sought treatment with his dermatologist in 2008, who did patch testing, which "revealed that Claimant was allergic to nickel sulfate, potassium dichromate [(chromium)], balsam of Peru[,] and cobalt dichloride." (WCJ Decision, May 1, 2014, Finding of Fact (FOF) ¶ 14.) When his position with that employer ended, Claimant began working for Employer in 2009, but was subject to layoffs when Employer did not have work for him. (R.R. at 34a-35a.) On his most recent layoff, Claimant did non-bricklaying work for a different employer until Employer recalled him. (*Id.* at 44a.)

While working as a bricklayer, Claimant continued to get the rash intermittently, with the symptoms worsening with each break out. In April 2012, while laying brick for Employer, he again developed a rash. After seeking treatment with Dr. Laury, Claimant informed Employer's foreman (Foreman) that his physician removed him from work due to the rash. Claimant did not recall specifically what he told Foreman regarding the cause of the rash. (*Id.* at 43a, 46a.) He continued to treat with Dr. Laury and has not returned to work. Claimant agreed that he was not working for another employer while working for Employer in April 2012. (*Id.* at 35a.) Claimant received unemployment compensation benefits when he stopped working in April 2012.

Claimant presented the deposition of Dr. Laury, who is board-certified in allergies/immunology and internal medicine and with whom Claimant initially sought treatment for a rash in February 2009. Dr. Laury indicated that the medical

records of Claimant's treating dermatologist reflected that, per prior diagnostic testing, Claimant had allergies to cobalt and chromium. (FOF ¶ 14; R.R. at 103a-04a.) Dr. Laury explained that, "[a]s a bricklayer, Claimant was regularly exposed to both cobalt and chromium in the course of [his] employment." (FOF ¶ 14.) After Dr. Laury treated Claimant with oral steroids, Claimant's symptoms improved and Claimant returned for treatment only as needed. Claimant returned to Dr. Laury on April 19, 2012, with a rash on his forehead, hands, and legs. Claimant told Dr. Laury that the rash went away when he was not working. Based on the history provided by Claimant, Claimant's medical records, the results of Claimant's diagnostic tests, and his physical examination of Claimant, Dr. Laury opined "that Claimant's symptoms were the result of occupational exposure" and "diagnosed Claimant with allergic contact dermatitis as a result of occupational exposure to chromium." (*Id.* ¶ 15.) Dr. Laury recommended that Claimant not return to work as a bricklayer, noting that Claimant's condition was worsening and he could not continue to take the prescribed systemic oral steroid without it having long-term effects on Claimant's health, some of which could be life threatening. (R.R. at 106a-07a, 109a, 135a.) Dr. Laury acknowledged that, as of his August 14, 2012 examination, Claimant's rash had "cleared up." (*Id.* at 110a-11a.)

Claimant also introduced the IME physician's medical report, not to prove that he suffered a work-related injury as set forth in that report, but to support his claim that Employer's contest became unreasonable in November 2012. After performing the IME on November 6, 2012, the IME physician indicated in her medical report that Claimant had "chromium induced occupational contact dermatitis, chronic and severe." (FOF ¶ 16.) The medical report stated,

4

"Claimant's allergy to chromates would be permanent and that 'he absolutely cannot have a job as a bricklayer ever again.'" (*Id.* (quoting R.R. at 175a).)

Employer did not present any medical evidence, but did present Foreman's testimony. Foreman explained Claimant began working for Employer in October 2009, Claimant would be temporarily laid off when Employer had little work, Claimant was eligible for unemployment compensation during these layoffs, and Claimant remained Employer's employee during these layoffs. (R.R. at 73a-75a.) Foreman was Claimant's supervisor and was aware Claimant had a rash. Claimant informed him on April 16, 2012, that Claimant would not be returning to work because of the rash issue, but he did not remember if Claimant stated that the rash was work-related. Foreman received a text message from Claimant on April 20, 2012, in which Claimant again stated he was not able to return to work. When Foreman subsequently spoke with Claimant, Claimant said "he was allergic to 'most everything in the construction industry' and would probably need to find a different job." (FOF ¶ 12 (quoting Hr'g Tr. at 14, R.R. at 71a).)

Employer also presented evidence regarding Claimant's wages with Employer, which supported an AWW of $682.37 and a corresponding compensation rate of $454.81. It also offered evidence of Claimant's receipt of unemployment compensation benefits in the net amount of $516 per week for weeks ending June 9, 2012, through March 8, 2013. Claimant challenged Employer's wage information by presenting, as evidence of his wages, copies of his tax returns for the years 2010 and 2011, which included $43,630 from Employer and $12,246 from a concurrent employer. Claimant also testified that, in his most recent work for Employer, he was earning $30.90 per hour for a 40-hour

work week, resulting in a weekly wage of $1236. The WCJ accepted Claimant's evidence and found that Claimant's AWW was $1236.[3]

After reviewing the evidence, the WCJ found Claimant's testimony credible and persuasive and found Foreman's testimony credible on the issue of when Employer received notice that Claimant's injury was work related. The WCJ credited Dr. Laury's testimony, observing Dr. Laury is Claimant's treating physician and his opinions were supported by his multiple examinations of Claimant, diagnostic testing, and the evidence as a whole. While the WCJ noted the IME medical report was not offered or entered into evidence to prove that Claimant suffered a work-related injury, but to support Claimant's request for unreasonable contest attorneys' fees, the medical report "unequivocally relate[d] Claimant's condition to his employment." (FOF ¶ 28.) Based on these findings, the WCJ concluded Claimant met his burden of proof on the Claim Petition by "establish[ing] the causal connection between Claimant's employment and the aggravation of Claimant's preexisting dermatitis which resulted in [his] removal from employment as a bricklayer as of April 19, 2012." (WCJ Decision, Conclusion of Law (COL) ¶ 2.) The WCJ further held Claimant's "work-related injury in the nature of allergic contact dermatitis" "rendered him incapable of returning to work as a bricklayer," and Employer did not present evidence that it had work available that would not require Claimant to be exposed to chromium. (*Id.* ¶ 3.) According to the WCJ, Claimant gave Employer timely notice of the

---

[3] In finding that Claimant's AWW was $1236, the WCJ apparently multiplied Claimant's most recent hourly wage by the number of hours Claimant was expected to work on the current project for Employer. This would be an application of the formula set forth in Section 309(d.2) of the Act, added by Section 5 of the Act of June 24, 1996, P.L. 350, 77 P.S. § 582(d.2), the only subsection of Section 309 that utilizes this formula for calculating the AWW.

6

work injury, having filed the Claim Petition within the required 120-day notice period. Therefore, the WCJ granted the Claim Petition and directed Employer to pay Claimant WC benefits of $824 per week, based on an AWW of $1236, from April 16, 2012, forward with credit for the unemployment compensation benefits Claimant received. (WCJ Order, April 28, 2014.) The WCJ denied the Penalty Petition "[u]pon [his] review of the evidence of record in its entirety."[4] (*Id.*)

### B. The Board's September 10, 2015 Opinion

Both Employer and Claimant appealed to the Board. Employer first challenged the WCJ's award of ongoing benefits beginning April 16, 2012. It asserted, relevant here, that Claimant did not give it notice within 21 days of the injury; thus, his receipt of benefits could not begin until the date he gave notice. The Board concluded a remand on this issue was necessary. It observed that Section 311 of the Act, 77 P.S. § 631, requires a claimant to give notice of an injury within 120 days and provides that unless a claimant gives notice within 21 days after the injury, no compensation is due until notice is given. The Board noted a claimant's compliance with these notice requirements was a question of fact for the WCJ, but the WCJ did not make a finding regarding when Claimant advised Employer that his rash was work related. Accordingly, the Board remanded for the WCJ to do so and, if necessary, adjust the date from whence Claimant's WC benefits should begin.

---

[4] On the issue of attorneys' fees, the WCJ concluded that, while Employer's contest began as reasonable, it became unreasonable as of November 6, 2012, and directed Employer to pay Claimant's counsel a quantum meruit fee for his work on the matter after that date. Employer did not appeal that determination.

Employer further argued that Claimant had fully recovered from his work-related aggravation of the preexisting dermatitis as of August 14, 2012, and, therefore, ongoing benefits should not have been awarded. The Board agreed, citing *Bethlehem Steel Corporation v. Workers' Compensation Appeal Board (Baxter)*, 708 A.2d 801 (Pa. 1998). The Board held that, under *Baxter*,

> if exposure results in an ongoing disabling condition, benefits may continue; however, where no restrictions from the work-related injury exist, and only the threat of future recurrences prevents the claimant from performing [the] pre-injury job, the claimant no longer is entitled to benefits when his condition returns to baseline. Like the claimant in *Baxter*, Claimant's injury was an aggravation injury and the medical evidence presented and accepted established that Claimant recovered from the work-related injury.

(Board Opinion (Op.) at 10.) Because Dr. Laury did not testify to any ongoing or permanent work injury and agreed that Claimant had essentially recovered from the rash as of August 14, 2012, the Board held that Claimant had returned to his pre-injury baseline condition and his entitlement to benefits ended as of that date. Accordingly, the Board modified the WCJ's decision "to reflect a termination of benefits as of August 14, 2012." (*Id.* at 11.)

Finally, Employer asserted the WCJ erred in finding that Claimant had concurrent employment and increasing Claimant's AWW based on that employment. Employer argued that because Claimant testified that he did not work for anyone else at the same time he was working for Employer, his AWW should have been calculated using his wages from "the 4 completed 13-week periods immediately preceding the date of injury." (*Id.*) The Board agreed that the WCJ's finding that Claimant had "concurrent employment" was not supported by Claimant's credited testimony and Claimant could not "be deemed [as] hav[ing]

8

had concurrent employers." (*Id.* at 12.) The Board, therefore, vacated the WCJ's calculation and remanded for a new calculation of Claimant's AWW and corresponding compensation rate in accordance with Section 309 of the Act, 77 P.S. § 582.

In his appeal, Claimant argued the WCJ erred in denying the Penalty Petition. After reviewing the penalty provisions of the Act, Section 435 of the Act, 77 P.S. § 991,[5] and the Act's requirement that an employer timely investigate an injury, Section 406.1(a) of the Act, 77 P.S. § 717.1(a),[6] the Board observed that the WCJ had summarily denied the Penalty Petition without discussion. Because Section 422(a) of the Act, 77 P.S. § 834, required a reasoned decision on this issue, the Board remanded for a determination that would satisfy the reasoned decision requirements.

### C. The WCJ's Remand Decision

The WCJ issued a new decision addressing the issues remanded to him. First, with regard to notice, the WCJ found it was undisputed that Claimant advised Employer in April 2012 that he could not return to work due to his severe rash. However, the WCJ found Claimant did not inform Employer that this condition was related to his work with Employer at that time. Instead, the WCJ found Claimant later informed Foreman that the rash was due to his "exposure to materials in the construction industry." (WCJ Remand Decision, Finding of Fact (Remand FOF) ¶ 6.) The WCJ found that this statement did not place Employer on notice that the rash was related to Claimant's work for Employer because Claimant

---

[5] Added by Section 3 of the Act of February 8, 1972, P.L. 25, *as amended*.
[6] Added by Section 3 of the Act of February 8, 1972, P.L. 25, *as amended*.

had worked for other employers in the construction industry. On this basis, the WCJ found that, for the purpose of Section 311 of the Act, Employer received notice of Claimant's injury on June 21, 2012, the date Claimant filed the Claim Petition.

Second, with regard to Claimant's AWW, the WCJ reviewed the evidence regarding Claimant's wages from the last 4 completed 13-week periods of employment with Employer, without considering any alleged concurrent employment. Based only on the evidence related to Claimant's work for Employer during those periods, the WCJ added Claimant's highest three quarters and divided that number by three, resulting in an AWW of $728.38 with a compensation rate of $485.58.

Finally, in addressing the Penalty Petition, the WCJ noted that Claimant bore the burden of proving a violation of the Act and the asserted violation here was that Employer failed to timely accept or deny liability for Claimant's injury. The WCJ held, however, that Employer's obligation to do so arose only after it received notice of the injury. Because notice was not received until Claimant filed the Claim Petition in June 2012 and Employer filed a timely answer denying the pertinent allegations and had Claimant submit to an IME, the WCJ concluded Claimant did not establish Employer's violation of the Act and denied the Penalty Petition.

## D.    The Board's January 12, 2018 Opinion

Claimant appealed the WCJ's remand decision to the Board, arguing the WCJ erred in terminating his benefits as of August 14, 2012, and in recalculating Claimant's AWW, because Claimant continued to disagree with the Board's prior

10

decision. Noting that the Board had addressed these issues in its prior opinion, the Board declined to revisit those determinations, while acknowledging that Claimant had preserved those issues for further appeal purposes.

Claimant also challenged the WCJ's conclusion that Employer did not violate the Act by virtue of its late response and by not issuing a notice of compensation payable (NCP) once the IME physician found that a work-related injury had occurred. The Board concluded that, pursuant to Section 406.1, Employer was required to promptly investigate Claimant's injury and begin making payments "not later than the twenty-first day after [it] ha[d] notice or knowledge of" Claimant's disability, or, if it disputed the right to compensation, to promptly notify Claimant of its decision. 77 P.S. § 717.1(a), (c); *see also* 34 Pa. Code § 121.13. The failure of Employer to issue the appropriate document within 21 days of receiving notice of a work injury is a technical violation of the Act. *Johnstown Hous. Auth. v. Workers' Comp. Appeal Bd. (Lewis)*, 865 A.2d 999, 1004 (Pa. Cmwlth. 2005). The Board found no authority to support the WCJ's conclusion that, because Employer filed an answer denying the Claim Petition's allegations, Employer was excused from its obligations under Section 406.1. Although the amount of penalties is generally within the discretion of the WCJ, the Board found a 10-percent penalty was, as a matter of law, appropriate under Section 435(d) due to Employer's technical violation of the Act. Accordingly, the Board reversed the WCJ's denial of the Penalty Petition and awarded Claimant a 10-percent penalty, and reaffirmed its prior determinations regarding the termination of Claimant's benefits and calculation of Claimant's AWW.

11

Both Claimant and Employer petition this Court for review.[7]

## II. Appeal to this Court

Claimant raises two arguments before this Court. First, he argues his WC benefits should not have been terminated as of August 14, 2012, because he established his entitlement to ongoing WC benefits notwithstanding the cessation of the symptoms associated with his work-related chromium allergy. Second, he asserts his AWW was miscalculated and that wages from his work with a different employer while he was laid off should have been considered concurrent employment in order to reflect his economic reality. Employer raises one argument, which is that the amount of a penalty is a matter for the WCJ and the Board's *sua sponte* imposition of the 10-percent penalty improperly infringed upon the WCJ's discretion.

### A. *The Termination of Claimant's Benefits*

#### 1.     The Parties' Arguments

Claimant argues the Board erred in terminating his benefits as of August 14, 2012, because he did not suffer from a preexisting condition and had no work-related medical restrictions at the time he developed his chromium allergy. Rather, he maintains, the medical evidence establishes that his underlying allergy to chromium was the result of his prolonged exposure to that substance in the course and scope of his work, and this allergy, which manifests as contact dermatitis,

---

[7] This Court's "review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law[,] or whether necessary findings of fact are supported by substantial evidence." *City of Phila. v. Workers' Comp. Appeal Bd. (Sherlock)*, 934 A.2d 156, 159 n.5 (Pa. Cmwlth. 2007).

12

prevents him from ever working as a bricklayer again. Claimant argues that Dr. Laury and the IME physician both opined that he could never return to work as a bricklayer due to the risk of chromium exposure, and, therefore, he has suffered a loss of earnings due to his work-related injury. Although his allergy initially manifested during his work for a previous employer, he was able to continue working as long as he wore gloves and other safety equipment. However, during his time working for Employer, his injury progressed and he is no longer able to work at all. The fact that he is asymptomatic when he is not exposed to chromium does not preclude the receipt of ongoing WC benefits because his condition will recur, and continue to become more dangerous, when he is again exposed at work. In other words, according to Claimant, his work injury has become disabling because he can now no longer perform the job that he had been able to perform when he started his employment with Employer. Thus, he has not returned to the condition he was in when he began working for Employer, and he should not have to continue to expose himself to a substance that is toxic to him, in order to be eligible for benefits. Claimant argues that our Supreme Court's opinions in *Lash v. Workmen's Compensation Appeal Board (General Battery Corporation)*, 420 A.2d 1325 (Pa. 1980), and *Farquhar v. Workmen's Compensation Appeal Board (Corning Glass Works)*, 528 A.2d 580 (Pa. 1987) (plurality), support his entitlement to ongoing benefits.

Employer responds that Claimant was no longer eligible for WC benefits because his injury was a work-related aggravation of a preexisting condition, which had resolved as of August 14, 2012. Employer argues Claimant's chromium allergy, diagnosed in 2008, is a preexisting condition that was not caused by his work for Employer, which did not begin until 2009. It began when he worked for

13

a previous employer. The aggravation of this work injury he experienced while working for Employer was resolved, and he returned to his baseline condition on August 14, 2012, when he stopped working. Then, the compensable injury ended, and his entitlement to WC benefits ceased. Here, Claimant's work-related condition was caused by his work for a previous employer. Therefore, the cases that Claimant relies upon are inapplicable, because in those cases, the condition was caused by the claimants' employment with the employer against whom the claims were being filed. Employer argues the Board correctly terminated Claimant's benefits based on *Baxter* as of August 14, 2012.[8]

## 2. Discussion

In a claim petition proceeding, the claimant bears the burden of establishing all of the elements necessary to support an award of WC benefits, including the existence of an injury and disability, and a causal relationship between the injury and the claimant's work. *Giant Eagle, Inc. v. Workers' Comp. Appeal Bd. (Thomas)*, 725 A.2d 873, 876 (Pa. Cmwlth. 1999). Disability is the loss of earnings or earning power that is caused by a work-related injury. *Sch. Dist. of Phila. v. Workers' Comp. Appeal Bd. (Lanier)*, 727 A.2d 1171, 1172 (Pa. Cmwlth. 1999). The burden remains on claimants to show that their work-related injury continues to cause disability throughout the pendency of the claim proceeding. *Somerset Welding & Steel v. Workmen's Comp. Appeal Bd. (Lee)*, 650 A.2d 114,

---

[8] Employer also argues Dr. Laury's testimony indicates that Claimant was exposed to an allergen related to the refinishing of the floor in Claimant's home and that this was a cause of Claimant's rash. (R.R. at 124a-26a.) However, Dr. Laury explained that, even if there was exposure at Claimant's home, it was short lived and the work exposure was more of a substantial or major factor because Claimant's symptoms improved after he left work. (*Id.* at 124a, 126a, 135a.)

14

119 (Pa. Cmwlth. 1994). The "WCJ is authorized, when considering a claim petition, to award compensation for a work-related injury, and, in addition, to terminate benefits as of the date the disability ceased, . . . if the claimant has not carried [his or her] burden of proof to establish a continuing disability." *Ohm v. Workmen's Comp. Appeal Bd. (Caloric Corp.)*, 663 A.2d 883, 886 (Pa. Cmwlth. 1995).

Relevant here, claimants may be considered disabled by a work-related injury despite the resolution of their symptoms "if there is evidence that [the symptoms] are likely to recur once [they] return[] to work." *Schrader Bellows Pneumatics, Div. of Parker-Hannifin Corp. v. Workers' Comp. Appeal Bd. (Earle)*, 711 A.2d 578, 581 (Pa. Cmwlth. 1998). Where claimants "establish that they [are] unfit or unable to perform their duties when they return[] to work" by unequivocal medical testimony, ongoing disability can be established. *Id.* However, a mere "possibility of a future recurrence does not constitute a compensable disability." *Swartz v. Workmen's Comp. Appeal Bd. (Dutch Pantry Rest.)*, 543 A.2d 201, 204 (Pa. Cmwlth. 1988).

Claimant contends that he is similar to the claimants in *Lash*, who, when they became "lead absorbers," meaning that they absorbed lead into their blood at abnormally high rates which made future exposures to lead hazardous, were reassigned to lower paying, non-lead handling positions by the employer. 420 A.2d at 1325. Although the claimants' health had not yet deteriorated to advanced lead poisoning, the Supreme Court held they did not have to work until they became ill in order to establish a compensable injury because the evidence established that their becoming "lead absorbers" was a direct result of their work and future exposure to lead would be perilous to their health. *Id.* at 1326. In

15

rejecting the employer's argument that the claimants were not yet eligible for WC benefits, our Supreme Court explained "[i]t would be barbaric to require . . . employees to continue in a position where [they are] exposed to a toxic substance until [they are] so ill that [they] physically [are] incapable of performing [their] job." *Id.* at 1327.

Claimant also contends that, even though he is not currently exhibiting symptoms from his work-related condition, he is entitled to ongoing benefits under the Supreme Court's reasoning in *Farquhar*, because those symptoms will recur and become increasingly more dangerous to his health if he returns to his pre-injury duties. The claimant in *Farquhar* worked as a screen maker and developed, in the course of her employment, effort thrombosis (blood clot) resulting in her hospitalization and inability to perform her work duties for a period. 528 A.2d at 582. After she received WC benefits for that injury, she returned to work at the same position and experienced a flare up of her thrombosis. The claimant's physician told her not to perform the strenuous work duties again and that she was permanently unfit to perform those duties. Following her discharge for refusing to follow the employer's directive that she perform those strenuous duties, the claimant sought the reinstatement of her WC benefits. The medical evidence established that the claimant should never perform her work duties again and, to do so, "would expose her to great risk of another, potentially more dangerous thrombosis attack" and was akin to "playing Russian Roulette." *Id.* at 583. Because the claimant was not exhibiting symptoms at the time she sought reinstatement, the WCJ denied reinstatement, which the Board and this Court affirmed. On further appeal, the Supreme Court reversed, observing that "the conclusion of the lower tribunals that, because [the claimant's] symptoms had

16

disappeared . . . and her condition had 'normalized,' she was not totally disabled and could not, therefore, recover compensation" was "absurd[] and fl[ew] in the face of the substantive law." *Id.* at 587 (citing *Lash*, 420 A.2d 1326-27). Noting that due to the nature of the claimant's condition, "the consequences threatened to be more severe if she were to experience another episode," the Supreme Court held that "[i]t [was] inexplicable that the lower tribunals would deny her compensation simply because her symptoms were not currently manifesting . . . ." *Id*. at 588.

We agree with Claimant that his situation is similar to these cases where, although the **work-related injury** became asymptomatic when the claimants were not working, ongoing benefits were awarded because their injuries would recur upon the claimants' return to work. Had Claimant worked just for Employer during his bricklaying career, it would be clear that Claimant's work-related injury would be compensable. Such a result would be consistent with other cases that followed *Lash* and *Farquhar*. For example, in *Henry Paul Cadillac, Inc. v. Workmen's Compensation Appeal Board (Stephens)*, 496 A.2d 1364, 1366 (Pa. Cmwlth. 1985), the claimant was entitled to ongoing benefits where his physician testified that the claimant had become sensitized to particular allergens over his years of work such that the physician did not "think [the claimant] can do it anymore, because the least exposure now that he has, even if it's minimal, he's probably going to break out." Similarly, in *Schrader Bellows*, the claimant was entitled to ongoing WC benefits where he suffered, over numerous years, multiple incidents of contact dermatitis due to the coolants used by the employer. 711 A.2d at 579-80. In support of an award of ongoing benefits, the claimant's physician testified that, due to the airborne nature of the coolants, "regardless of where in the plant or which type of position [the e]mployer would provide, [the c]laimant will

17

continue to experience the dermatitis as long as he is working at [the e]mployer's facility." *Id.* at 580.

Employer argues, and the Board agreed, that Claimant's situation is more like the claimant's aggravation of a preexisting, **non-work-related** condition in *Baxter*. In *Baxter*, the claimant had suffered from asthma since childhood, which was aggravated by his exposure to paint fumes at work. 708 A.2d at 801. This aggravation, however, did not result in any permanent injury to the claimant. The employer paid for the time the claimant was unable to work due to the aggravation, but the claimant did not return to his pre-injury position at his physician's recommendation. The claimant's physician testified that the claimant's lung functions had returned to normal, but that his severe **non-work-related asthma** placed him at risk of future exacerbation of that condition if he returned to work. The physician further explained that the restrictions on the claimant's ability to work in a dusty environment "had nothing to do with [the claimant's] actual employment at [the employer] . . . . [and] would have been placed on [the c]laimant whether or not he ever worked at [the employer] or had the episodes of exacerbation of his preexisting asthma . . . ." *Id.* at 802-03 (emphasis and quotation marks omitted). The referee granted the claim petition, and both the Board and this Court affirmed.

The employer appealed to the Supreme Court, which reversed. It held that the claimant had not established his eligibility for ongoing benefits because he had fully recovered from the work-related aggravation of his preexisting, non-work-related asthma. The Supreme Court observed that the **underlying condition aggravated in *Baxter* was preexisting and not work-related**, and not like the residual **work-related injuries** that had never resolved in *Lash* and *Farquhar*. The

Court explained that "[t]he claimant in *Farquhar* continued to suffer from thrombosis which was caused by her employment; [and] the *Lash* claimants continued to suffer from lead absorption which was caused by their employment." *Baxter*, 708 A.2d at 804. And that, "[h]ad Baxter introduced medical evidence . . . that his exposure to paint fumes at [work] had resulted in an ongoing condition that affected his pulmonary capacity, *Farquhar* and *Lash* would be controlling." *Id.* However, his physician testified that there was "**no evidence** that the claimant had sustained any continuing changes to his pulmonary capacity or in the functioning of his lungs." *Id.* (emphasis added). Because there had been no ongoing changes, the Supreme Court held that once the claimant had fully recovered from the work-related aggravation of his preexisting, non-work-related asthma and his condition returned to its baseline, the claimant was ineligible for benefits because his disability was no longer related to the conditions of his workplace. *Id.* To hold otherwise, the Supreme Court reasoned, would "undermine[] the principles of the [WC] Act [by] impos[ing] liability on an employer for the existence of a condition present from childhood when **no residual work-related injury is demonstrated**." *Id.* (emphasis added).

Unlike the claimant's asthma in *Baxter,* which was not work-related but developed while that claimant was a child, Claimant's severe allergy to chromium was caused by his long-term exposure to chromium working as a bricklayer. Thus, Claimant has a work-related condition. Because Claimant here worked as a bricklayer for a prior employer, during which time his allergy manifested, Employer argues that the allergy is a preexisting condition that merely was aggravated by his work for Employer. Employer argues *Baxter* applies and Claimant should not receive ongoing benefits because Claimant, having become

asymptomatic as of August 14, 2012, had returned to his baseline condition. However, Claimant was able to perform the bricklaying job when he started working for Employer. While he did have to use gloves, and eventually started taking systemic steroids to control his symptoms, his condition has now progressed and worsened such that it is not safe for him to continue to do so. (Dr. Laury's Dep. at 43, R.R. at 107a, 109a-10a, 135a.) Both Dr. Laury and the IME doctor have credibly opined that Claimant has an allergy to chromium due to his long-term work exposure to that substance, which the IME doctor described as "chronic and severe" and "permanent," and that "'he absolutely cannot have a job as a bricklayer ever again.'" (FOF ¶¶ 14-16 (quoting IME physician's medical report at 2, R.R. at 175a); R.R. at 103a-04a, 113a-14a.) Dr. Laury agreed with the IME doctor's observations. (R.R. at 114a.) Under these circumstances, we cannot conclude that Claimant's condition has returned to its baseline.

Claimant's current restriction from working as a bricklayer is a result of his continued exposure to chromium, which occurred while working for Employer. That Claimant should receive ongoing benefits is, thus, consistent with our precedent. For example, in *Reinforced Molding v. Workers' Compensation Appeal Board (Haney)*, 717 A.2d 1096, 1100-01 (Pa. Cmwlth. 1998), the claimant, as part of his work duties, was exposed to styrene, which aggravated a preexisting, non-work-related lung condition and caused the claimant to develop asthma. The WCJ found that the compensable work-related injury was the aggravation caused by the claimant's work exposure to styrene, which rendered him incapable of performing his work duties. *Id.* at 1099. There was no testimony that the claimant's restrictions would have been imposed had he not worked for his present employer and developed the styrene sensitization and asthma that aggravated the claimant's

20

underlying lung condition. *Id.* at 1102 n.4. Because the medical evidence in *Haney* established that the claimant "should never return to his time of injury job which would expose him to styrene lest he suffer renewed aggravation," we affirmed, holding the claimant bore his burden of proving that he was disabled from performing that job and was eligible for ongoing benefits. 717 A.2d at 1101. *See also Bethlehem Steel Corp. v. Workmen's Comp. Appeal Bd. (Boles)*, 713 A.2d 1116, 1117 (Pa. 1998) (per curiam order) (affirming determination that where a work-related aggravation continued to affect the claimant's pulmonary function, an award of ongoing benefits was appropriate); *accord McCabe v. Workers' Comp. Appeal Bd. (Dep't of Revenue)*, 738 A.2d 503, 507 (Pa. Cmwlth. 1999) (remanding for a determination as to whether the restrictions placed upon the claimant were causally related to the preexisting, non-work-related asthma, or the work-related aggravation of her underlying asthma due to exposure to cigarette smoke at work).[9]

Claimant's situation here is similar to *Little v. Workers' Compensation Appeal Board (Select Specialty Hospital)*, 113 A.3d 1 (Pa. Cmwlth. 2015), a recent case. There, the claimant, who had no preexisting asthmatic condition or work-related medical restrictions, was exposed multiple times to a chemical used by her employer causing her to develop a sensitivity to that chemical and occupationally induced asthma. *Id.* at 2-3, 5. Although granting her benefits for a closed period,

---

[9] On remand, the WCJ in *McCabe* accepted additional medical evidence from both the employer and the claimant. The WCJ credited the employer's evidence establishing that the claimant had fully recovered from the temporary work-related aggravation of her underlying asthmatic condition, she suffered from no residual physical injuries as a result of her work exposure to cigarette smoke, and the restrictions imposed were not "causally related to her prior exposures at work." *McCabe v. Workers' Comp. Appeal Bd. (Dep't of Revenue)*, 806 A.2d 512, 515 (Pa. Cmwlth. 2002). Based on that evidence, the WCJ denied the claim for ongoing benefits based on *Baxter*, and both the Board and this Court affirmed. *Id.* at 515, 517.

the WCJ terminated them based on an IME physician's testimony that the claimant had "fully recovered with no residual disability or pulmonary impairment." *Id.* at 3. On appeal, the Board affirmed the denial, but this Court reversed. Because the claimant did not have a preexisting asthmatic condition or work-related medical restrictions prior to her work injury, the claimant's "baseline condition materially differed" before and after her cumulative workplace exposure to the chemical. *Id.* at 7. This change, the medical experts agreed, constituted a "residual medical condition[]" that prevented the claimant from returning to her pre-injury position. *Id.* at 8. As in *Little*, Claimant's baseline condition materially differed between when he started working for Employer and when, due to his ongoing exposure to chromium, his work-related condition became so severe that he could no longer be exposed to that material without endangering his health. It was Claimant's exposure to chromium while working for Employer, and the resulting aggravation of his work-related chromium sensitivity, that have rendered him incapable of performing his work duties.[10] Claimant has, therefore, satisfied his burden of proving that, notwithstanding his current lack of symptoms or need for treatment, he is disabled from performing his job as a bricklayer for Employer, or anyone else, and is eligible for ongoing benefits.

---

[10] Holding otherwise would require claimants, particularly those who, due to the nature of their work in the unionized trades, may work for multiple employers over the course of their working life, "to continue in a position where [they are] exposed to a toxic substance until [they are] so ill that [they are] physically . . . incapable of performing [their] job." *Lash*, 420 A.2d at 1327.

## B. The Calculation of Claimant's AWW
### 1.    The Parties' Arguments

Claimant next argues the Board erred in vacating the WCJ's initial calculation of his AWW.  He claims his AWW should have been calculated using Section 309(d.1) of the Act because he was not an ongoing employee of Employer due to his being laid off and obtaining work with another employer during the year prior to his injury, and he did not work 3 consecutive periods of 13 calendar weeks.[11]  He argues the Supreme Court's decision in *Reifsnyder  v. Workers' Compensation Appeal Board (Dana Corporation)*, 883 A.2d 537 (Pa. 2005), should not apply because the claimant in that case was a long-term, continuous employee of the employer subject to a collective bargaining agreement (CBA) who had periods of layoffs during which the claimant did not work for other employers. In contrast, here, there is no CBA and Employer does not deny he worked for other companies during layoff periods.  Applying *Reifsnyder*, Claimant asserts, would be contrary to the purpose of the Act because the resulting calculation would not be an accurate measure of his future wage loss caused by his work injury as it does not recognize "the economic reality" of his recent pre-injury earning experience. *Triangle Bldg. Ctr. v. Workers' Comp. Appeal Bd. (Linch)*, 746 A.2d 1111, 1112 (Pa. 2000).  Claimant also argues that pursuant to Section 309(e), his AWW should have included his wages from the "concurrent" employment in which he engaged during his layoffs from Employer.

---

[11] Using this calculation would result in an AWW of $1234.04 and a compensation rate of $822.69.

23

Employer replies[12] that it and Claimant had a continuing employment relationship between October 2009 and April 2012, and, therefore, the WCJ's calculation of Claimant's AWW using Section 309(d) on remand is consistent with the Supreme Court's decision in *Reifsnyder*. Employer further asserts that including earnings Claimant received from unemployment or a second employer during his layoffs is not necessary to ensure an accurate reflection of Claimant's earnings history while he maintained continuous employment with Employer during the 4, 13-week periods immediately preceding the April 2012 work injury. Employer also contends that the WCJ correctly calculated Claimant's AWW without considering any concurrent employment because Claimant testified he was not working for another employer at the time he sustained the work injury in April 2012.

### 2.    Discussion
#### a.    Which Subsection applies to calculate Claimant's AWW?

Subsections 309(d), (d.1), and (d.2),[13] 77 P.S. § 582(d), (d.1), (d.2), describe the various methods of calculating an AWW where wages are not fixed by the week, month, or year. Those statutory provisions state:

---

[12] Employer also argues Claimant waived his arguments regarding the calculation of his AWW because he did not include them in his Petition for Review. Pennsylvania Rule of Appellate Procedure 1513, Pa.R.A.P. 1513; *Tyler v. Unemployment Comp. Bd. of Review*, 591 A.2d 1164, 1168 (Pa. Cmwlth. 1991). However, Rule 1513 was amended in 2014 to state that, while an appellate jurisdiction petition for review should include a general statement of a petitioner's objections, "the omission of an issue from the statement shall not be the basis for a finding of waiver if the court is able to address the issue based on the certified record." Pa.R.A.P. 1513(d)(5). As we are able to address this issue based on the certified record, Claimant's arguments are not waived.

[13] Subsections (d.1) and (d.2) were added by Section 5 of the Act of June 24, 1996, P.L. 350, 77 P.S. § 582(d.1), (d.2).

24

(d) If at the time of the injury the wages are fixed by any manner not enumerated in clause (a), (b) or (c), the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods.

(d.1) If the employe has not been employed by the employer for at least three consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury, the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer for any completed period of thirteen calendar weeks immediately preceding the injury and by averaging the total amounts earned during such periods.

(d.2) If the employe has worked less than a complete period of thirteen calendar weeks and does not have fixed weekly wages, the average weekly wage shall be the hourly wage rate multiplied by the number of hours the employe was expected to work per week under the terms of employment.

77 P.S. § 582(d), (d.1), (d.2). We are cognizant that "the overall legislative purpose of Section 309 [is] to provide for an accurate measurement of the AWW." *Reifsnyder*, 883 A.2d at 545 (citing *Hannaberry HVAC v. Workers' Comp. Appeal Bd. (Snyder, Jr.)*, 834 A.2d 524, 533-34 (Pa. 2003)). The proper manner of calculating an AWW is a question of law subject to plenary review. *Id.* at 541.

In *Reifsnyder*, the Supreme Court addressed how to calculate a claimant's AWW where the claimant had "work-related layoffs for business/economic reasons in the relevant look-back period." *Id.* at 539. This work scenario, the Court observed, was not specifically addressed by the statutory language, but explained that

Section 309(d) governs employees with the longest work/employment histories-*i.e.,* employees who have been employed for at least four consecutive periods of thirteen calendar weeks. Subsections (d.1) and

25

(d.2) address progressively shorter employment relationships: (d.1) governs employees employed for at least one, but less than three consecutive periods of thirteen calendar weeks; while (d.2) addresses cases of recent hires, *i.e.,* employees who worked less than a single complete period of thirteen calendar weeks at the time they suffered a work injury.

*Id.* at 546. It further described subsections (d) and (d.1) as "includ[ing] look-back periods encompassing the preceding [52] weeks, in search of 'completed' [13]-week periods." *Id.* Therefore, Section 309(d) would apply to any "long-term employment relationship" even when that "relationship happens to involve periods with a 'work' cessation," *i.e.*, a layoff. *Id.* at 547. The Court further observed

the general rule set forth in Section 309(d) does not speak in terms of the continuity of "work," but rather, the continuity of the "employment" relationship. The fact that [the c]laimants were not "working" during the periods when they were laid off does not mean that their long-term "employment" relationship was severed.

*Id.* Because the employment relationship was maintained during layoff periods, the claimants there "had a long-term employment relationship by which their actual history of earnings and earning capacity could be measured." *Id.* Section 309(d) applied "to capture that entire relevant period." *Id.*

Here, Claimant was employed by Employer since October 2009, subject to certain periods of layoff followed by a return to work for Employer. That he was laid off from his work with Employer during that period and worked for another employer does not mean the employment relationship was not maintained. *See Elliot Turbomachinery Co. v. Workers' Comp. Appeal Bd. (Sandy)*, 898 A.2d 640, 648 (Pa. Cmwlth. 2006) (stating "[t]he term 'employ' or 'employed' [as used in Section 309(d)] is not limited to actual days an employee performs work, but encompasses the period of time that an employment relationship is maintained

26

between the parties"). Claimant acknowledges that Employer was aware that he worked for a different employer while he was laid off, but Employer still recalled him to work. This is different than the employer's policy in *Janson v. Workers' Compensation Appeal Board (EM Force, Inc.)*, 49 A.3d 458, 459-60 (Pa. Cmwlth. 2012), where, if an employee obtained alternative employment during a layoff, the policy provided that the employment relationship ended and required the employee to reapply for work.[14] This continued employment relationship, which included a history of layoff periods, is similar to that in *Reifsnyder*. Section 309(d) thus applies, and Claimant's earning capacity was appropriately measured by using the highest 3 of the last 4 consecutive periods of 13 calendar weeks in the year immediately preceding Claimant's work injury, which represented his "actual history of earnings." *Reifsnyder*, 883 A.2d at 547. Because using Claimant's earnings history reflects the "economic reality of [his] recent pre-injury earning experience," *Triangle Building Center*, 746 A.2d at 1112, it is an accurate measure of his earning capacity and there was no error in calculating Claimant's AWW using Section 309(d) of the Act.

b.    Should Claimant's AWW include wages from his other employment?

Section 309(e) provides, in relevant part, that "[w]here the employe is working under concurrent contracts with two or more employers, his wages from all such employers shall be considered as if earned from the employer liable for compensation." 77 P.S. § 582(e). However, for a claimant's employment with a

---

[14] In *Janson*, however, based on the credited testimony of the employer's witness that the employer was **unaware** that the claimant had found alternative employment during the layoff period, the WCJ found that the employment relationship was maintained notwithstanding the policy and the claimant obtaining alternate employment. 49 A.3d at 459-60, 463.

second employer to qualify as "concurrent employment," the claimant had to have been working for both employers "**at the time of the [work] injury**." *Freeman v. Workmen's Comp. Appeal Bd. (C.J. Langenfelder & Son)*, 527 A.2d 1100, 1101-02 (Pa. Cmwlth. 1987) (emphasis in original). We have explained that "the General Assembly's use of the present tense [in Section 309(e)] negates any intention to include within its ambit workers who have previously been employed by concurrent employers." *Id.* at 1101. Because Claimant testified that he worked only for Employer in April 2012, the Board did not err in concluding that Claimant could not be deemed as having concurrent employment at the time of his work injury.

### C. Penalty Petition

Employer appeals from the Board's Order, arguing the Board erred in reversing the WCJ's determination that Claimant did not establish a violation of the Act and in, *sua sponte*, awarding a 10-percent penalty. The decision to impose a penalty falls within the discretion of the WCJ and, here, Employer asserts, the WCJ found, based on the credible testimony of Foreman, that Employer's timely filed answer denying that Claimant suffered from a work-related injury and promptly scheduled IME provided Claimant with notice that Employer was denying his claim. According to Employer, issuing a Notice of Compensation Denial (NCD), the lack of which the Board found was a "technical violation of the Act," would simply have reiterated what it stated in its timely answer. (Employer's Brief (Br.) at 23-24.) Based on these facts, Employer argues, the WCJ exercised his discretion to determine that no penalty was warranted, and the Board erred by usurping that discretion.

28

Claimant responds it is well-settled that an employer's failure to timely issue the appropriate WC Bureau document accepting or denying an alleged work injury is a violation of the Act and should result in an award of penalties. Section 406.1 of the Act requires the issuance of such a document within 21 days of being notified of a claimant's injury or disability. 77 P.S. § 991; *Brutico v. Workers' Comp. Appeal Bd. (US Airways, Inc.)*, 866 A.2d 1152, 1155 (Pa. Cmwlth. 2004). According to Claimant, Employer's reasons for not complying with Section 406.1 are insufficient because Employer was fully aware of Claimant's work-related disability as of November 6, 2012, the date its IME physician indicated Claimant suffered from a work-related injury and could not return to his pre-injury position. Employer's refusal to acknowledge its liability, Claimant maintains, continued for months after the IME, and reflects Employer's decision not to comply with the Act notwithstanding it being apparent that Claimant had sustained a disabling work-related injury. As such, Claimant argues, the Board's decision to find a violation of the Act and to award a penalty was not erroneous.

Section 435(d)(i) of the Act allows for a penalty of up to 50 percent of the compensation due to be assessed if an employer violates the Act or its regulations.[15] 77 P.S. § 991(d)(i). In penalty petition proceedings, the claimant

---

[15] Section 435(d)(i)-(iii) states, in its entirety:

(d) The department, the board, or any court which may hear any proceedings brought under this act shall have the power to impose penalties as provided herein for violations of the provisions of this act or such rules and regulations or rules of procedure:

(i) Employers and insurers may be penalized a sum not exceeding ten per centum of the amount awarded and interest accrued and payable: Provided, however, That such penalty may be increased to fifty per

**(Footnote continued on next page…)**

"bears the burden of proving a violation of the Act occurred" and, if met, the burden "shifts to the employer to prove it did not violate the Act." *Dixon v. Workers' Comp. Appeal Bd. (Medrad, Inc.)*, 134 A.3d 518, 525 (Pa. Cmwlth. 2016) (quoting *Gumm v. Workers' Comp. Appeal Bd. (Steel)*, 942 A.2d 222, 232 (Pa. Cmwlth. 2008)). "When a violation of the Act occurs, it is within the discretion of the WCJ to impose penalties." *Jordan v. Workers' Comp. Appeal Bd. (Phila. Newspapers, Inc.)*, 921 A.2d 27, 41 (Pa. Cmwlth. 2007). The WCJ has the discretion to assess a penalty and, if assessed, to determine the amount of the penalty. *Id.* This discretion is not unfettered, *Croman v. Workers' Compensation Appeal Board (Township of Marple)*, 706 A.2d 408, 410 (Pa. Cmwlth. 1998), and "[a]n abuse of discretion is not merely an error of judgment but occurs, . . . , when the law is misapplied in reaching a conclusion." *Westinghouse Elec. Corp. v. Workers' Comp. Appeal Bd. (Weaver)*, 823 A.2d 209, 213-14 (Pa. Cmwlth. 2003).

The Board found that Employer's failure to issue a document accepting or denying Claimant's injury as work-related violated Section 406.1(a), (c) of the Act. Those provisions state, in relevant part:

---

**(continued…)**

    centum in cases of unreasonable or excessive delays. Such penalty shall be payable to the same persons to whom the compensation is payable.

    (ii) Any penalty or interest provided for anywhere in this act shall not be considered as compensation for the purposes of any limitation on the total amount of compensation payable which is set forth in this act.

    (iii) Claimants shall forfeit any interest that would normally be payable to them with respect to any period of unexcused delay which they have caused.

77 P.S. § 991(d)(i)-(iii).

(a) The employer and insurer shall promptly investigate each injury reported or known to the employer and shall proceed promptly to commence the payment of compensation due either pursuant to an agreement upon the compensation payable or a notice of compensation payable as provided in section 407 or pursuant to a notice of temporary compensation payable as set forth in subsection (d), on forms prescribed by the department and furnished by the insurer. The first installment of compensation shall be paid not later than the twenty-first day after the employer has notice or knowledge of the employe's disability.

. . . .

(c) If the insurer controverts the right to compensation it shall promptly notify the employe or his dependent, on a form prescribed by the department, stating the grounds upon which the right to compensation is controverted and shall forthwith furnish a copy or copies to the department.

77 P.S. § 717.1(a), (c). "An employer violates Section 406.1 of the Act if it fails to issue an NCP, an NCD, or a Notice of Temporary Compensation Payable . . . within [21] days of receiving notice of a work-related injury" and "can be liable for penalties for" not doing so. *Coyne v. Workers' Comp. Appeal Bd. (Villanova Univ.)*, 942 A.2d 939, 951 (Pa. Cmwlth. 2008); *Lemansky v. Workers' Comp. Appeal Bd. (Hagan Ice Cream Co.)*, 738 A.2d 498, 502 (Pa. Cmwlth. 1999) (stating "the Act indicates that [an e]mployer does have an affirmative obligation to accept or deny the injury as work-related within [21] days of notice"). This is true even if the employer is actively contesting the claimant's claim, "since contesting a claim does not relieve an employer of its duty under" Section 406.1 of the Act. *Spangler v. Workmen's Comp. Appeal Bd. (Ford)*, 602 A.2d 446, 448 (Pa. Cmwlth. 1992); *see also Croman*, 706 A.2d at 410. However, where "there is a violation of the Act, even an **apparent** violation, the imposition of a penalty **is not automatic**." *Brutico*, 866 A.2d at 1155-56 (second emphasis added).

Here, Employer did not issue an NCP or an NCD acknowledging or denying Claimant's injury as work-related and instead issued an answer to the Claim Petition contesting Claimant's claim. The fact that Employer was actively contesting that claim, however, did not relieve Employer from the requirements of Section 406.1 of the Act, *Spangler*, 602 A.2d at 448, and its failure to comply with those requirements is a technical violation of the Act, *Coyne*, 942 A.2d at 951. Although the Board correctly held that the WCJ erred in not finding a violation of the Act, not every violation of the Act requires, as a matter of law, the automatic imposition of a penalty. *Brutico*, 866 A.2d at 1155. Rather, whether a penalty is appropriate is at the discretion of the WCJ. Unfortunately, we must therefore "remand . . . to the WCJ to take into consideration whether . . . penalties are appropriate." *Moore v. Workmen's Comp. Appeal Bd. (Reading Paperboard Corp.)*, 676 A.2d 690, 695 (Pa. Cmwlth. 1996). In doing so, we note that the Board awarded a 10-percent penalty on an award of benefits for a closed period of time. Having reversed the termination of Claimant's benefits as of August 14, 2012, the WCJ will have to consider whether a technical violation of the Act warrants the imposition of a penalty on what is now an award of ongoing benefits.

### III.     Conclusion

For the foregoing reasons, we find that Claimant is entitled to ongoing benefits, and therefore we reverse that part of the Board's Order affirming the termination of Claimant's WC benefits as of August 14, 2012. We affirm that part of the Board's Order affirming the calculation of Claimant's AWW as $728.38, and that part of the Board's Order reversing the denial of the Penalty Petition. However, we must vacate the award of a 10-percent penalty and remand the matter

to allow the WCJ to exercise his discretion on whether to award a penalty based on Employer's technical violation of the Act.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Thomas Kurpiewski,                         :
           Petitioner            :
                                 :
           v.                  :    No. 158 C.D. 2018
                                 :
Workers' Compensation Appeal              :
Board (Caretti, Inc.),                     :
           Respondent           :
                               :
Caretti, Inc.,                             :
           Petitioner            :
                               :
           v.                  :    No. 194 C.D. 2018
                               :
Workers' Compensation Appeal              :
Board (Kurpiewski),                        :
           Respondent           :

## O R D E R

    **NOW**, January 18, 2019, the Order of Workers' Compensation Appeal Board (Board) entered in the above-captioned matter is **REVERSED** to the extent it affirmed the termination of Thomas Kurpiewski's (Claimant) workers' compensation benefits as of August 14, 2012, **AFFIRMED** to the extent it affirmed the calculation of Claimant's average weekly wage as $728.38, and **AFFIRMED** to the extent it reversed the denial of Claimant's Penalty Petition. The imposition of a 10-percent penalty is **VACATED**, and the matter is **REMANDED** for further proceedings consistent with the foregoing opinion.

    Jurisdiction relinquished.

 

                                          _____
                                          **RENÉE COHN JUBELIRER,** Judge