**SOUTHWEST AIRLINES/CAMBRIDGE INTEGRATED SERVICE, Petitioners**

v.

**WORKERS' COMPENSATION APPEAL BOARD (KING), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted April 24, 2009.

Decided July 30, 2009.

Amended Dec. 4, 2009.

Publication Ordered Dec. 4, 2009.

---

Stephen M. Beaudoin, Philadelphia, for petitioner.

Anna V. Rio, Upper Darby, for respondent.

BEFORE: SMITH–RIBNER, Judge, and LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

Southwest Airlines (Employer) petitions for review of an adjudication of the Workers' Compensation Appeal Board (Board) granting the claim petition of Cheryl King (Claimant). In doing so, the Board affirmed the decision of the Workers' Compensation Judge (WCJ) that Claimant sustained a compensable work-related injury. Concluding that the testimony of Claimant's medical expert was not competent to prove the cause of Claimant's disability, we reverse.

The facts are as follows. Claimant began employment in October 2005 and was placed in a training program for an operations agent. Claimant's duties involved operating the jetway doors between the aircraft and the terminal as passengers boarded and deplaned their flights. According to Claimant, on October 20, 2005, she was "hit in the face and head by a metal door while walking in the jetway." Claim Petition at 1. As a result of this incident, she claimed to have experienced headaches, dizziness, blurred vision, head and neck pain, blackouts and difficulty remembering things. Claimant has not returned to work.

At a hearing before the WCJ, Claimant testified that the accident occurred at the end of her shift in the afternoon, when she was struck by the left jetway door.[1]

---

1. Claimant testified before a WCJ on January 25, 2006, and additional testimony was pre-

Claimant also testified that she could not recall whether there were any witnesses to the incident. Claimant did not manifest any injuries, such as a bruise, a bloody nose or a bump; however, she did report severe head pain to her supervisor, Cynthia Rasco.

Claimant testified that she had never been involved in a slip and fall, motor vehicle accident, or any other type of incident where she could have injured her head or neck, either before or after October 20, 2005. Claimant testified that she never had any problems with, or received treatment for, headaches, migraines, dizziness, blackouts or memory loss.

Cross-examination established that Claimant had injured her head in a bus accident, but Claimant could not remember when the accident occurred; what, if any symptoms she had; how long those symptoms lasted; or if she received any treatment. Claimant also admitted injuring her head on January 9, 2003, when she struck it on her truck door. She recalled being treated for dizziness, headache and nausea following that incident, but could not remember the duration of that treatment.

Claimant was cross-examined about several workers' compensation claims she filed between 1992 and 1997. Claimant did not dispute the accuracy of the records, but stated repeatedly that she could not remember the substance of the claims. Specifically, Claimant did not remember reporting headaches, blurred vision and dizziness in 1992; headaches, neck pain and cervical sprain and strain while she was employed by St. Paul Fire & Marine in November 1994; chronic headaches in 1995; or a head injury with headaches, dizziness and difficulty concentrating while she was employed by Chase Bank in 1997. Reproduced Record at 207a–209a (R.R. ——). When confronted with her family physician's medical record of February 21, 2006, which recorded Claimant's statement that she had never suffered headaches, blurred vision or double vision, Claimant could not remember having that conversation.

Claimant presented the deposition testimony of Steven D. Grossinger, D.O., board-certified in internal medicine and neurology, who first examined Claimant on December 12, 2005. At that time, Claimant reported to Dr. Grossinger that she had been struck squarely on her forehead by a metal door on October 20, 2005, when "another worker in front of her closed the door with impact in the region of her forehead." R.R. 29a. Claimant told Dr. Grossinger that she did not seek medical treatment on the day of the incident, which was a Thursday. She returned to work the following Monday and was directed to seek treatment at the Healthmark Occupational Center. Dr. Grossinger testified that after an x-ray and CT scan of Claimant's brain were taken at Healthmark, Claimant was diagnosed with a concussion and cervical sprain.

Based upon his examination of Claimant, Dr. Grossinger opined that she was suffering from post-concussive syndrome, which can be manifested by headaches, dizziness, blurring of vision, as well as some cognitive disturbance. Dr. Grossinger further opined that Claimant was unable to return to work because of her persistent problems with headaches, dizziness, visual impairment and trouble with concentration.

On cross-examination, Dr. Grossinger stated that he had no personal knowledge

---

sented by deposition. After the record was closed, the initial WCJ retired. The matter was reassigned to another WCJ, who rendered a decision without the benefit of observing Claimant's demeanor.

of Claimant's physical condition prior to December 12, 2005. He was unaware whether Claimant had ever sought treatment for the types of complaints she presented to him. The medical questionnaire Claimant submitted to Dr. Grossinger indicated that she had no prior injuries or problems. Dr. Grossinger confirmed that Claimant's current CT scan and x-rays were normal and that there were no physical findings of any trauma in any of Claimant's medical records.

Employer presented the deposition testimony of Collette Gore, an operations agent assigned to train Claimant beginning on October 17, 2005. Gore testified that she spent the entire afternoon of October 20 with Claimant and did not witness any incident like that described by Claimant. According to Gore, she entered the jetway with Claimant and three flight attendants to await the arrival of an incoming flight. As the aircraft taxied in, Gore was at the control panel on the left side of the jet bridge and Claimant was standing approximately 15 feet away from the jetway doors. While they waited for the airplane, Claimant asked to speak with another supervisor, Cynthia Rasco, whom Gore summoned by radio. After the plane taxied and parked, Gore maneuvered the jet bridge against the aircraft and opened the two jetway doors, which Gore explained open inward like french doors. The left door is next to the control panel. Once the jet bridge is maneuvered against the aircraft, the jetway doors are opened and locked in place; if the doors do not lock in place, they close slowly because they are pressurized.

Gore recalled that she was standing in the doorway of the aircraft when Rasco arrived, and Claimant was on the jetway opposite the left door that supposedly had struck Claimant. Gore informed Rasco that Claimant wanted to speak with her and then continued with her duties on the aircraft. By the time Gore exited the aircraft, Claimant and Rasco were gone.[2]

Employer next presented the deposition testimony of Rasco. She testified that when she arrived at the jetway on the day in question, three flight attendants were present along with Gore and Claimant, who was "[s]even, eight, [or] nine feet" from the jetway door. R.R. 178a. Claimant and Rasco returned to Rasco's office to discuss Claimant's complaint that her training was deficient. Claimant alleged that Gore had slammed a door and stormed off during an earlier conversation with Claimant. During her conversation with Rasco, however, Claimant did not state that she had been struck by the slammed door, and Rasco did not see any physical marks on Claimant's forehead or face. Rasco did not learn of Claimant's claim that she was struck by the jetway door until two days after the alleged event. Rasco confirmed that the jetway doors could not be slammed shut because they are pressurized.

Employer also presented the deposition of Paul M. Shipkin, M.D., a board-certified neurologist who examined Claimant on May 30, 2006. Dr. Shipkin recalled that Claimant told him her health was "okay" around the time of the alleged work incident. R.R. 66a. When Dr. Shipkin inquired why Claimant's health was only "okay," and not "excellent" prior to that

2. Employer also presented the deposition testimony of one of the flight attendants, Tara Geck, who testified that on the afternoon of October 20 she was on the jetway with two other crew members and Gore. Although Geck could not specifically remember Claimant, she did not recall anything unusual about the crew change and did not witness anyone being injured or hit during that time.

time, Claimant responded only by saying, "I can't remember." *Id.* Thereafter, Claimant explained how on the day of the incident the person training her "flung the doors back, [and] hit me in the face." R.R. 67a. Claimant acknowledged that the incident did not cause any bleeding or bruising, but did cause a dull ache in her forehead.

Claimant then identified several symptoms that continued to bother her from the injury: unprovoked, spontaneous headaches, which she described on a scale of 0 to 10 as "9 1/2" or "suicide level;" constant pain in the back of her neck; depression; anxiety and dizziness. R.R. 70a–71a. Claimant stated that she had no other neurological symptoms. Dr. Shipkin asked her about her health prior to the injury and Claimant stated she had no prior accidents, injuries, illnesses, or surgical procedures. When asked why she did not feel excellent given her lack of prior illnesses and injuries, Claimant declined to answer, claiming she could not remember. Claimant did not want to talk about her pertinent social history, and when asked about her education, she stated she had attended two colleges but could not remember where the colleges were.

Dr. Shipkin testified that Claimant's selective memory and lack of relevant medical history were significant factors. He opined that patients are typically consistent in their ability to respond to his questions; if they can answer with precise detail in one situation, they can generally do so in other situations rather than saying "I can't remember or I'm not going to tell you." R.R. 74a. Dr. Shipkin reviewed Claimant's medical records from the injury, including the CT scan taken approximately a week after the incident. According to Dr. Shipkin, it did not show any intracranial injuries, any bruising of the scalp, or any blood under the scalp, which would be expected if Claimant had been bruised. Dr. Shipkin described the CT scan as "flat out normal." R.R. 77a. In addition, there was no indication on any of the studies that Claimant had sustained a head trauma.

Dr. Shipkin performed a physical examination and found certain non-physiological responses strongly suggestive of symptom magnification. For example, Claimant stated that she was unable to move her neck. At various points during the examination, however, Claimant moved her neck normally with full range of motion. Dr. Shipkin also observed Claimant backing her automobile out of her parking space after the evaluation, fully twisting her head around with no signs of discomfort and driving away in a normal fashion.

Dr. Shipkin tested Claimant's cranial nerves by shining an ophthalmoscopic light into her right eye. She exhibited no signs of discomfort. When he repeated the process in her left eye, Claimant recoiled and claimed that it was extremely painful. Dr. Shipkin found this reaction to be non-physiological unless Claimant had an extremely severe retinal disease, which he knew not to be the case.

Dr. Shipkin next placed a tuning fork above both of Claimant's eyes. Claimant claimed that she felt the vibrations of the tuning fork above her right eye but not above her left eye. Dr. Shipkin explained that this was another non-physiological reaction because even someone without sensation on one side of the body, such as a stroke victim, has normal bone conduction on both sides of the forehead because the forehead is comprised of one single bone, not two.

Dr. Shipkin also did motor testing, asking Claimant to touch her finger to her nose. Claimant's movements were bizarre, sloppy, choppy and hesitant. At the same time, he observed her using her

hands normally for fine motor activities such as picking up her purse, reaching into her purse, and handling the steering wheel of her automobile. In sum, Dr. Shipkin explained that Claimant's motor responses were consistent with symptom magnification.

Dr. Shipkin disagreed with Dr. Grossinger's diagnosis of post-concussive syndrome; he opined that Claimant had no neurological issues and exhibited no problems that could be related in any way to an incident at work on October 20, 2005. Although Dr. Shipkin did not dispute that Claimant hit her head, he opined that in view of the entire clinical package, including Claimant's actions, there was nothing to support the conclusion that Claimant suffered a concussion or was suffering from post-concussive syndrome. In Dr. Shipkin's opinion, Claimant sustained a trivial head injury on October 20, 2005, or none at all. Dr. Shipkin admitted that a person could have sustained a strike to the forehead significant enough to cause a cervical problem and "concussion" and still have a normal CT scan or x-ray, but that was dependent on how one defined a "concussion." Nonetheless, Dr. Shipkin could find no evidence in any of Claimant's medical records to show that she had suffered a trauma. Based upon his findings and diagnosis, Dr. Shipkin placed no restrictions on Claimant's activities because Claimant did not require any additional medical care or treatment.

The WCJ found as fact that on "October 20, 2005, a coworker struck Claimant in the face and head with a metal jet way door." WCJ Opinion, Finding of Fact No. 1(b) (F.F. ——). The WCJ further found that Claimant experienced headaches, dizziness, blurred vision, head and neck pain,

which continue and prevent her from performing her pre-injury job duties. The WCJ credited Claimant's testimony regarding how the injury occurred because it "was consistent with the history she provided to Dr. Grossinger and Dr. Shipkin, . . . the documented treatment and history provided to [Healthmark]" and Dr. Grossinger's testimony, which the WCJ also credited. F.F. No. 9.

The WCJ determined that Employer's fact witnesses were not credible to the extent that their testimony differed from Claimant's testimony. The WCJ based her decision not to credit Employer's witnesses on the fact that "[a]ll three witnesses remain employed by Employer and thus may be influenced by their ongoing employment status." F.F. No. 10(e).

The WCJ found the testimony of Dr. Grossinger more credible and persuasive than that of Dr. Shipkin because it was consistent with the diagnosis and findings of the Healthmark Occupational Center, and because Dr. Grossinger had examined Claimant on more than one occasion. The WCJ did not find the testimony of Dr. Shipkin credible or persuasive because Dr. Shipkin saw Claimant on only one occasion. Based on the foregoing findings, the WCJ granted Claimant's claim petition, and the Board affirmed.

On appeal, Employer presents two issues for our consideration. First, it asserts that the WCJ erred in crediting Dr. Grossinger's testimony, which was not competent because it was not based upon a review of Claimant's complete medical records and was not supported by objective data.[3] Further, Employer contends that the WCJ capriciously disregarded factual and medical evidence and rendered a decision not supported by substantial evidence of record.[4]

3. For ease of resolution, we have reversed the issues presented by Employer.

4. The scope of our review is limited to determining whether constitutional rights were

Claimant, as the moving party in a claim petition proceeding, bears the burden of proving all elements necessary to support an award, including the existence of an injury and disability and a causal relationship between the work-related injury and the alleged incident. *Inglis House v. Workmen's Compensation Appeal Board (Reedy)*, 535 Pa. 135, 141, 634 A.2d 592, 595 (1993). Where the causal connection is not obvious, unequivocal medical testimony is required to establish the causal connection between the work incident and the disability. *Povanda v. Workmen's Compensation Appeal Board (Giant Eagle Markets, Inc.)*, 146 Pa. Cmwlth.320, 605 A.2d 478, 481 (1992). The determination that medical evidence is unequivocal is a legal conclusion and is fully reviewable by this Court. *Id.*

Employer maintains, relying on *Newcomer v. Workmen's Compensation Appeal Board (Ward Trucking Corp.)*, 547 Pa. 639, 692 A.2d 1062 (1997), that the WCJ erred in determining that Claimant's medical evidence was legally sufficient to support an award of benefits. Specifically, Employer contends that because the testimony showed that Dr. Grossinger had no knowledge of Claimant's prior head and neck injuries and history of headaches, dizziness, concentration problems, blurred vision, and corresponding treatment, his testimony on causation lacked a competent foundation. We agree.

In *Newcomer*, our Supreme Court determined that a doctor's testimony that the claimant suffered a work-related injury was incompetent because it was not supported by the claimant's medical records or the factual history of the case. The claimant had been treated for abdominal and chest injuries at the time of the work injury, then later represented to his medical expert that he had been treated for a shoulder injury. The Court rejected the doctor's medical opinion that the shoulder injury was work-related because that opinion was based solely on the claimant's self-serving version of his medical history. In other words, the opinion of the claimant's medical expert lacked a foundation in the evidence of record.

*Chik–Fil—A v. Workers' Compensation Appeal Board (Mollick)*, 792 A.2d 678 (Pa. Cmwlth.2002), is also instructive. In that case, the claimant testified that she injured her back while lifting a heavy tub and had previously suffered a back injury in 1995. On cross-examination, it was established that claimant had been treating with chiropractors for neck and back problems since 1987. Claimant's expert explained that his diagnosis was based upon claimant's complaints and medical history, including two slip-and-fall incidents in 1995, but that he did not review any of her previous medical records. The WCJ granted claimant's claim petition. The Board affirmed, concluding that employer's objections to claimant's medical expert testimony concerned the weight of the evidence, not its competency. This Court reversed the decision of the Board because the medical

violated, whether an error of law was committed or whether the findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704; *Richardson v. Workers' Compensation Appeal Board (American Surfpak)*, 703 A.2d 1069, 1071 n. 4 (Pa.Cmwlth.1997). The "capricious disregard" of evidence standard of review is a component of appellate review where the question is properly raised before the Court. *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 571 Pa. 189, 203, 812 A.2d 478, 487 (2002). Capricious disregard is a deliberate disregard of competent evidence which one of ordinary intelligence could not possibly have avoided in reaching the result. *Remaley v. Workers' Compensation Appeal Board (Turner Dairy Farms, Inc.)*, 861 A.2d 405, 409 (Pa.Cmwlth.2004).

expert's opinions were based on an incomplete and inaccurate medical history. The claimant's own expert testified that if claimant's medical history was not as reported, his evaluation would be incorrect. Thus, we found claimant's medical expert's testimony not competent as to causation.

Having reviewed Dr. Grossinger's testimony in its entirety, we agree with Employer that it was incompetent. Dr. Grossinger diagnosed Claimant with post-concussive syndrome related to a work injury, but he did so without any personal knowledge of Claimant's physical condition prior to his examination. Dr. Grossinger did not review any of Claimant's extensive relevant medical records, which would have revealed two head injuries and complaints of headaches, blurred vision, dizziness and neck pain beginning in 1992. Claimant obfuscated her medical history by stating in a medical questionnaire she completed for Dr. Grossinger that she had suffered no prior injuries or medical problems. In sum, Dr. Grossinger's opinions were based on an incomplete and inaccurate medical history, as well as Claimant's personal opinion of causation. Thus, as a matter of law, Dr. Grossinger's medical opinion was not competent to establish a causative link between the work injury and Claimant's disability. Absent medical evidence on causation, the WCJ's determination was not supported by substantial evidence. We must, therefore, reverse the Board's order affirming the WCJ's decision.

We turn briefly to Employer's argument that the WCJ capriciously disregarded evidence and made findings of fact not supported by substantial evidence of record. Employer asserts that Claimant's testimony about the work-related injury was contradicted by Employer's witnesses and the physical location and mechanics of the jetway door, which could not have been slammed shut as Claimant alleged. Employer also contends the WCJ erred by not addressing the numerous inconsistencies in Claimant's testimony. Finally, Employer contends the WCJ erred by presuming that Employer's witnesses were untruthful simply because they remained employed by Employer. Some of these arguments are directed to the weight the WCJ afforded the evidence, which is beyond the scope of this Court's review.[5]

However, we need not decide Employer's capricious disregard of evidence issue. Whether the incident on the jetway occurred as Claimant described, which Employer vehemently denies was possible given Newton's laws of physics, is of no moment. Claimant did not sustain her burden of proving a causal relationship between her alleged injury on the jetway and her disability.[6] In the absence of

---

5. The WCJ's imputation of bias to Employer's fact witnesses simply because they "remain employed by Employer and thus may be influenced by their ongoing employment status" appears unfounded. F.F. No. 10(e). There is no competent evidence of record to support the WCJ's presumption of bias as to these witnesses. Accepting the WCJ's reasoning would also mean that employers could never present current employees as witnesses in workers' compensation matters. By this logic, Claimant's testimony would also be tainted by bias, inasmuch as she is a former employee of Employer and has a direct financial interest in the claim, which, incidentally, her ex-co-workers do not share.

6. We note, however, that the WCJ's finding that a "coworker struck Claimant" with the jetway door is not supported by any evidence of record. F.F. No. 1(b). Claimant testified that she was hit in the face and head with the left metal jetway door, and that there were no co-workers or witnesses present. R.R. 9a. Claimant later testified that Gore was working with her that afternoon, but did not recant or alter her testimony to reflect that Gore witnessed the event or, indeed, was the cause of the accident. With no competent evidence

competent medical evidence to establish this causation, Claimant did not meet her burden of proof.

It was Claimant's burden to establish all the elements necessary to support an award of benefits, including proof of a causal relationship between her injury and her disability through competent medical testimony. Claimant failed to do so. Her medical expert relied upon Claimant's own self-serving statements and was unaware of her extensive medical history, which included numerous prior injuries to Claimant's head and neck. As such, the expert's opinion was not competent to establish causation. Accordingly, we reverse the decision of the Board.

### ORDER

AND NOW, this 30th day of July, 2009, the order of the Workers' Compensation Appeal Board dated December 30, 2008, is hereby REVERSED.

to support the WCJ's finding, it may be disregarded. *See, e.g., Wintermyer,* 571 Pa. at 202 n. 11, 812 A.2d at 486 n. 11 (factual findings can be disturbed if there has been a capricious disregard of competent evidence or if there is no evidence at all to support the finding).

The WCJ compounded the error by crediting Claimant's testimony "regarding *how* the injury occurred [because it] was consistent with the history she provided to Dr. Grossinger and Dr. Shipkin." F.F. No. 9(a) (emphasis added). First, the doctors' testimony about how the accident occurred was inconsistent with Claimant's testimony; Claimant testified that she was alone when the accident happened and the doctors testified that Claimant

reported being hit with a door by a co-worker. Statements to a doctor are admissible insofar as they are necessary and proper for diagnosis and treatment of the injury and refer to symptoms, feelings and conditions. *Cody v. S.K.F. Industries, Inc.* 447 Pa. 558, 566, 291 A.2d 772, 776 (1972). Statements, however, that relate to the cause of the injury are not admissible, except when offered as part of the *res gestae* or in an unwitnessed occurrence case when the party involved has died. *Id.* These exceptions are not implicated in this matter. Without personally observing the accident, the doctors' testimony regarding the workplace accident was hearsay and the WCJ's attempts to use the testimony as substantive evidence was error.