IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Home Depot USA, Inc.          :
            Petitioner        :
                              :
    v.                        :   No. 113 C.D. 2021
                              :   ARGUED:  November 18, 2021
Abdolrahi Noorani (Workers'   :
Compensation Appeal Board),   :
            Respondent        :

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge
          HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                          FILED:  December 23, 2021

Home Depot USA, Inc. (Employer) petitions this Court for review of the January 15, 2021 order of the Workers' Compensation Appeal Board (Board), affirming the decision of a workers' compensation judge (WCJ) who awarded Abdolrahi Noorani (Claimant) total disability benefits under the Workers' Compensation Act (Act),[1] for injuries Claimant sustained while in the course of his employment.  The issues before this Court are whether the Claimant's medical evidence was sufficient to support an award of benefits, and whether the WCJ failed to issue a reasoned decision as required by Section 422(a) of the Act.[2]  After review, we affirm.

## I.  Background

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

[2] 77 P.S. § 834.

Claimant worked as a customer service greeter at Employer's store from July 7, 2014, through November 8, 2015. Certified Record (C.R.), Item No. 23. On August 29, 2018, Claimant filed a claim petition seeking total disability benefits for an alleged work injury he claimed was caused by a severe reaction to a flu vaccination he received at work. *Id.*, Item No 2. Employer denied the material allegations in Claimant's petition and asserted that Claimant was not acting within the course and scope of his employment at the time he sustained the alleged work injury. *Id.*, Item No. 4.

## A. Claimant's Evidence

Claimant testified at a February 8, 2019 deposition that he worked for Employer approximately 20 hours each week for two years making approximately $11 per hour. C.R., Item No. 22, Claimant's dep., 2/8/19, at 7. He also worked part time at Grundy Commons, an office complex, making approximately $12 per hour. *Id.* at 9. On August 30, 2015,[3] Claimant received a flu vaccination administered at a vaccine clinic held each year on Employer's premises. *Id.* at 11-12. Claimant arrived at work prior to the start of his 2:30 p.m. shift for the specific purpose of receiving the flu vaccination because Employer encouraged its employees to do so. *Id.* at 13.

Claimant had previously received the flu vaccination from vaccine clinics held on Employer's premises and never experienced any negative side effects. *Id.* at 12. Claimant stated that the 2015 vaccination "was somehow different." *Id.* Claimant admitted having difficulty remembering some details of his symptoms and treatment from four years earlier; however, he recalled feeling tired for a few days

---

[3] The record reflects that Claimant received the vaccination on September 30, 2015, not August 30, 2015. Claimant clarified his testimony at an April 10, 2019 hearing before the WCJ. Notes of Testimony (N.T.), 4/10/19, at 25.

after receiving the vaccine, which eventually progressed to weakness in his legs.  *Id.* at 14-15.  He sought treatment from his primary care physician (PCP) "within a week or so," who advised Claimant that his symptoms would pass.  *Id.* at 16.  After the weakness in his legs progressed, Claimant returned to his primary care physician, who advised Claimant to go to the emergency room at Aria Hospital.  *Id.* at 18-19.  Claimant was treated there on November 4, 2015, and released with instructions to see an orthopedic specialist.  *Id.* at 19-20.  He returned to the Aria Hospital emergency room on November 8, 2015.  *Id.* at 20.  Initially, Claimant continued to work for both Employer and Grundy Commons; however, he did not return to work after November 8, 2015.  *Id.* at 47-48.

Claimant testified that the doctors at Aria Hospital asked if he received a flu vaccination and that they tested his spinal fluid to determine whether Claimant had Guillain-Barre syndrome (GBS).[4]  *Id.* at 22.  That same day, Claimant notified one of Employer's supervisors that he had been hospitalized and that his physicians suggested his condition may have been caused by the flu vaccination.  *Id.* at 41.  Claimant advised Employer that he would return to work, as he believed his symptoms would not last more than two days.  *Id.* at 43.  Three of Employer's employees, including the store manager and the supervisor with whom Claimant spoke, visited Claimant at the hospital that evening and gathered information regarding his condition.  *Id.* at 44.

Claimant experienced continued weakness in his legs and pain throughout his body, particularly on the right side.  *Id.* at 25.  After his discharge from Aria Hospital,

---

[4] GBS is an autoimmune disorder of sudden onset that is an inflammatory neuropathy affecting the peripheral nervous system.  *See* Definition of Guillain-Barré Syndrome by Merriam-Webster, https://www.merriam-webster.com/dictionary/Guillain-Barre%20syndrome (last viewed Dec. 21, 2021).

Claimant spent time at a rehabilitation facility. *Id.* at 25-26. Claimant was hospitalized a second time at St. Mary's Hospital, where physicians suspected Claimant had GBS. *Id.* at 28. Claimant stated that his symptoms have either stayed the same or gotten worse over time. *Id.* at 27. A cervical fusion performed on May 6, 2016, did not improve Claimant's condition. *Id.* at 29, 31-32. Claimant also underwent surgery to correct bladder and prostate dysfunction.[5] *Id.* at 31.

Claimant testified that, prior to August 2015, he had never been in any motor vehicle or other accidents and he was physically capable of performing his jobs for both Employer and Grundy Commons. *Id.* at 33, 48. Claimant testified he cannot walk much and uses either a walker or a wheelchair to move. *Id.* at 35. He suffers from pain, numbness, and tingling throughout his body. *Id.* at 39. Claimant also has difficulty using his hands, which prevents him from engaging in his previous activities, such as playing instruments. *Id.* Claimant filed a claim for benefits under the National Vaccine Injury Compensation Program (Vaccine Program),[6] but he had not received a determination in that matter. *Id.* at 45. Claimant's wife is unable to work, as she takes care of him. *Id.* at 50. His daughter works part time to support the family. *Id.* at 50-51.

Claimant also testified live before the WCJ at a hearing held on April 10, 2019. At that time, Claimant clarified that he received the flu vaccination at Employer's clinic on September 30, 2015, and not on August 30, 2015, as he first testified. N.T., 4/10/19, at 14, 27. Claimant previously treated his symptoms with

---

[5] While not entirely clear from the record, it appears that Claimant's bladder and prostate dysfunction ruled out GBS and was considered to be related to the alleged inflammatory response from the flu shot.

[6] 42 U.S.C. §§ 300aa-10 – 300aa-34. The Vaccine Program provides compensation to people found to be injured by certain vaccines. *See* National Vaccine Injury Compensation Program, https//www.hrsa.gov/vaccine-compensation/index.html (last visited Dec. 21, 2021).

physical therapy, but it was not very effective, and Claimant had transportation issues that made attendance difficult. *Id.* at 18. Claimant expressed a desire to return to work some day and "become productive," but he advised that it was not possible with his current condition. *Id.* at 21. He used a walker to attend the hearing, but otherwise used a wheelchair. *Id.* Claimant stated he can only sit in the wheelchair for short periods of time, so he is normally bedbound. *Id.* at 21-22. Because he has problems with urinating, Claimant did not eat or drink prior to the hearing, so he could attend "with no problem." *Id.* at 20.

Claimant presented the January 30, 2019 deposition testimony of his treating neurologist, Sami Khella M.D. In preparing his opinion, Dr. Khella reviewed Claimant's medical records and laboratory results from Aria Hospital, as well as a February 14, 2017 magnetic resonance imaging (MRI) study. C.R., Item No. 18, Khella dep., 1/30/19, at 8, 22.

Dr. Khella first examined Claimant on January 19, 2018. *Id.* at 9. At that time, Claimant presented with weakness in his feet and legs, and a sensation of pins and needles in his hands and feet. *Id.* Claimant initially used a walker but then required the use of a wheelchair, and he developed weakness in his hands. *Id.* While Claimant was not incontinent, he had developed urinary urgency and issues with his bowel. *Id.* Dr. Khella's records reflected that Claimant's symptoms evolved over the course of two months, then stabilized. *Id.*

The results of Dr. Khella's physical evaluation were mostly normal. *Id.* at 10. Claimant's limb strength was normal in the upper extremities except for his fingers, which were weak and his hand muscles had atrophied. *Id.* Claimant exhibited weakness, sensory loss, and spasticity in his legs. *Id.* at 10-11. Dr. Khella's preliminary diagnosis was that Claimant suffered from cervical myelopathy, which

Dr. Khella related to post-vaccination inflammatory transverse myelitis, given the onset of Claimant's limb weakness shortly after administration of the flu vaccination. *Id.* at 11-12. He dismissed cervical stenosis as a cause of Claimant's symptoms because that condition does not develop rapidly over weeks. *Id.* at 12-13. Dr. Khella acknowledged that Claimant had preexisting spinal stenosis and inflammation, which should have resolved with Claimant's 2016 cervical fusion. *Id.* at 13. In Claimant's case, however, Dr. Khella felt there was an additional injury which did not respond to the surgery. *Id.* Given the rapid advancement of Claimant's symptoms, Dr. Khella identified the flu vaccination as the cause of Claimant's condition. *Id.* at 16-17. Dr. Khella's course of treatment consisted of physical therapy and pain management. *Id.* at 14.

Claimant's condition appeared unchanged in subsequent examinations, the most recent of which took place on September 7, 2018, and Dr. Khella felt that Claimant's inflammatory response to the flu vaccination had stopped, although he acknowledged that Claimant might become more disabled due to the normal aging process. *Id.* at 14-15, 18.

Based on Claimant's clinical history, the results of Dr. Khella's clinical examination and the 2017 MRI, and the medical literature, Dr. Khella opined, to a reasonable degree of medical certainty, that a causal relationship existed between the flu vaccination Claimant received and his diagnosed condition. *Id.* at 18.

During cross-examination, Employer's counsel questioned Dr. Khella's understanding of Claimant's relevant medical history, given that Dr. Khella's medical file only consisted of 14 pages. *Id.* at 7, 22. Dr. Khella related that, while a patient's medical chart can generate thousands of pages, when asked for a specific medical opinion, Dr. Khella only identifies those records that are "relevant to the

6

question . . . being asked." *Id.* at 23. In Claimant's case, that question concerned "[w]hat was wrong" with him. *Id.*

Dr. Khella conceded that cervical myelopathy can progress in the absence of an inflammatory condition, but the "very high" and "really abnormal" level of Claimant's spinal fluid protein suggested to Dr. Khella that it was triggered by an inflammatory process and not cervical spine stenosis. *Id.* at 25, 27. He agreed that this inflammatory process could be related to the flu vaccination or to something else. *Id.* at 27-28. Dr. Khella identified the flu vaccination as the trigger, however, given the "temporal association" between the onset of his symptoms and his receipt of the flu vaccination. *Id.* at 25, 27-28, 34. The condition of Claimant's lumbar spine would not have contributed significantly to his clinical course, as any associated lumbar disease "would have to be quite severe" to cause the weakness in Claimant's lower extremities, and it would not have caused the weakness in his hands. *Id.* at 28-29. Dr. Khella disagreed that Claimant's records documented he suffered from GBS, as Dr. Khella specializes in treating that disease, and Claimant's examination in 2015 was "nothing like GBS." *Id.* at 31.

Claimant introduced a March 14, 2018 report from Lawrence Steinman, M.D. (Steinman Report), a neurologist from Stanford University, who opined that Claimant's cervical myelopathy was triggered by an inflammatory response caused by the flu vaccination.[7] Khella dep., Ex. C-2, at 1. Employer objected to the

---

[7] In forming his opinion, Dr. Steinman compared components of the 2015-16 vaccine to any antigens with a known association to transverse myelitis. Khella dep., Ex. C-2, at 10. He considered any antigen with "a run of [five] or more" identical amino acids to be a "meaningful molecular mimic . . . [that] was sufficient to trigger neuroinflammation." *Id.* at 10-11. The results of Dr. Steinman's research indicated that the 2015-16 flu vaccine shared the requisite number of identical amino acids with several antigens, including myelin basic protein, which may trigger transverse myelitis when combined with "[o]ther genetic and environmental factors." *Id.* at 11,
**(Footnote continued on next page…)**

introduction of the Steinman Report as inadmissible hearsay. Khella dep. at 20. Dr. Khella advised that he typically reviews such reports when treating his patients, and he agreed with Dr. Steinman's opinion. *Id.* at 20-21. Dr. Khella could not recall when he reviewed the Steinman Report, and he did not rely on it when formulating Claimant's course of treatment. *Id.*

## B. Employer's Evidence

Employer presented the June 25, 2019 deposition testimony of Richard Bennett, M.D., a board-certified neurologist, who performed an independent medical examination (IME) of Claimant on April 1, 2019. Bennett dep. at 6, 10. At that time, Claimant related the symptoms he experienced a few days after receiving a flu vaccination on either August or September 30, 2015. *Id.* at 11. Claimant related his symptoms, which included weakness in the upper and lower extremities, bladder impairment, and constipation, to the flu vaccination. *Id.* at 11-12. Dr. Bennett's review of Claimant's records confirmed that he presented with these symptoms at Aria Hospital on November 8, 2015, but he was subsequently discharged and admitted to a rehabilitation facility for therapy. *Id.* Subsequent treatment at St. Mary's Hospital on December 6, 2015, revealed evidence of myelomalacia and a possible diagnosis of GBS, for which Claimant underwent intravenous gamma globulin therapy. *Id.* at 12. A neurosurgical consultation led to the discovery of cervical myelopathy, which ultimately resulted in Claimant's cervical fusion. *Id.*

During the April 1, 2019 IME, Claimant advised Dr. Bennett that he had difficulty walking and used either a walker or wheelchair. *Id.* at 13. Claimant related he felt pain along the back in the midthoracic to lower lumbar region and continued

---

14-17. Dr. Steinman concluded that Claimant's underlying cervical stenosis represented one such factor, providing a "background of low[-]grade inflammation," which reacted to the September 30, 2015 flu vaccination, causing Claimant's transverse myelitis. *Id.* at 20.

to have weakness and numbness in his hands that extended to the upper cervical thoracic region. *Id.* He suffered from bladder and bowel disfunction, for which he took medication. *Id.* Based on a November 2, 2015 record from Claimant's PCP, Dr. Bennett estimated that Claimant's symptoms developed in late October or early November 2015, several weeks after he received the flu vaccination. *Id.* at 16-17. November 2015 records from Aria Hospital indicated that Claimant suffered from severe spinal stenosis. *Id.* at 18. Dr. Bennett advised that, based on these records, he would have referred Claimant for emergency surgical intervention to avoid a progression of symptoms related to the spinal stenosis. *Id.* at 18-19.

Dr. Bennett's physical examination of Claimant revealed symptoms consistent with the effects of a cervical spinal cord compression or myelopathy. *Id.* at 19. While Dr. Bennett agreed with Dr. Khella's description of Claimant's physical condition, he did not agree that Claimant's condition was the result of a flu vaccination. *Id.* at 21-22. Dr. Bennett denied that Claimant's medical records suggested such a diagnosis, which he considered purely speculative, and Dr. Bennett was not aware of any medical literature that would support Dr. Khella's opinion that Claimant's symptoms were causally related to his receipt of the flu vaccination. *Id.* at 22-23. Dr. Bennett opined that Claimant's records instead demonstrated a cervical spinal degenerative process that caused a compression of Claimant's spinal cord. *Id.* at 23.

Dr. Bennett agreed that the January 2016 cervical decompression did not dramatically improve Claimant's symptoms, but he related that negative outcome to Claimant's delay in having the surgery, which had been recommended two months prior by his physicians at Aria Hospital. *Id.* at 28-29, 33. He dismissed Dr. Steinman's Report as containing "a lot of hypothetical issues," but no scientific

evidence to connect the flu vaccine with acute transverse myelitis. *Id.* at 30-31. Dr. Bennett acknowledged a report of cases from 1976 and 1977 that linked a flu vaccine to the development of GBS, but he was not familiar with studies that suggested a similar link between transverse myelitis and the flu vaccine. *Id.* at 30. As Dr. Bennett understood, it was never determined whether the increase in GBS during the 1970s was related to the type of flu or the type of vaccine; however, after modification of the flu vaccine, the incidence of GBS has not appeared to the same degree as it did during that period. *Id.* Dr. Steinman's Report did not change Dr. Bennett's opinion regarding the cause of Claimant's symptoms. *Id.* at 30-31. Dr. Bennett reiterated his opinion that Claimant's flu vaccination was irrelevant and unconnected to Claimant's physical condition. *Id.* at 32. Dr. Bennett agreed that Claimant was permanently disabled. *Id.* at 35.

Employer also presented the August 9, 2019 expert report of Richard Cuneo, M.D., a neurology professor from the University of California, San Francisco, who reviewed Claimant's medical records, Claimant's live and deposition testimony, Dr. Khella's deposition testimony, and the Steinman Report. C.R., Item No. 27, at 2. Dr. Cuneo noted that the likelihood of a flu vaccination causing cervical myelopathy is miniscule, less than .385 per million doses, but that the major determinant as to causality is the time between receipt of the vaccination and the documented onset of a neurologic syndrome, and establishing an accurate timeline is one of the key features to establishing causality. *Id.* at 18. Claimant's medical records documented that he received the flu vaccination on September 30, 2015. *Id.* at 19. While Claimant remembered seeing his primary care physician approximately one week later, Claimant's medical records indicate that this visit took place on November 2, 2015, 33 days after Claimant received the vaccination. *Id.* Claimant's records from

Aria Hospital dated November 6 and November 8, 2015, document October 29, 2015 as the date Claimant began to experience weakness in his lower extremities. *Id.* at 20. Dr. Cuneo opined that this timeline rendered any relationship between Claimant's symptoms and his receipt of the flu vaccination on September 30, 2015, "most unlikely." *Id.* He considered the progression of Claimant's symptoms over the 5½ weeks that followed the September 30, 2015 flu vaccination "perfectly consistent" with a clinical course of compressive cervical myelopathy. *Id.* at 21.

Dr. Cuneo disputed Dr. Khella's opinion regarding the cause of Claimant's symptoms in part because Dr. Khella relied on the inaccurate history provided by Claimant. *Id.* This history led Dr. Khella to believe that Claimant began to experience weakness within a few days of the September 30, 2015 vaccination. *Id.* Dr. Steinman's Report suffered from the same defect, having been based on an inaccurate timeline which placed the onset of Claimant's symptoms at a much earlier date than the one documented in his medical records. *Id.* Dr. Cuneo also disagreed with Dr. Khella's analysis of Claimant's spinal fluid, as he felt it did not suggest an acute inflammatory reaction but was instead more consistent with a chronic compressive condition. *Id.* at 23.

Ultimately, Dr. Cuneo opined that Claimant suffered from long-standing preexisting cervical degenerative disc disease and central canal stenosis, which are conditions that often worsen over time. *Id.* Dr. Cuneo also believed that Claimant's condition worsened due to the delay in surgical intervention, which significantly reduced his likelihood of recovery. *Id.*

### C. WCJ Decision

In a decision circulated on November 5, 2019, the WCJ credited Claimant's live and deposition testimony. C.R., Item No. 10, Finding of Fact (F.F.) No. 20.

Having observed Claimant's live testimony, the WCJ found that he testified in a forthright manner. *Id.* The WCJ found particularly credible Claimant's testimony regarding the onset, location, and nature of his symptoms. *Id.* Claimant's testimony that his symptoms arose shortly after receiving the flu vaccination was supported by the fact that, prior to receiving it on September 30, 2015, Claimant was able to perform his job duties for Employer and Grundy Commons, and perform activities of daily living, without restriction. *Id.* The evidence established that Employer offered its employees a flu vaccination administered on its premises and that Employer encouraged its employees to get the flu vaccination. *Id.* The WCJ also found that Claimant notified Employer of his work injury on November 8, 2015. F.F. No. 23.

The WCJ found both Dr. Khella and Dr. Bennett credible; however, he gave greater weight to Dr. Khella's testimony, given his status as Claimant's treating neurologist who observed and examined Claimant on multiple occasions. F.F. No. 21. Dr. Bennett evaluated Claimant's condition once for the purpose of litigation. *Id.* Therefore, the WCJ rejected Dr. Bennett's opinion to the extent he disagreed with Dr. Khella that Claimant's cervical myelopathy was caused by post-vaccination inflammatory transverse myelitis. F.F. No. 21. The WCJ likewise rejected Dr. Cuneo's report to the extent it conflicted with the opinions of Dr. Khella, as Dr. Cuneo only reviewed Claimant's medical records on one occasion. F.F. No. 18.

The WCJ found that Dr. Khella's credibility was bolstered by his training and experience treating patients with a range of neurological disorders and by his position as a professor of neurology at the University of Pennsylvania. F.F. No. 21. Having credited the reasoning and rationale provided by Dr. Khella, the WCJ found that, while in the course of his employment, Claimant suffered a work injury to his

12

cervical spine at the C8-T1 level, which was caused by the flu vaccination Claimant received at Employer's premises on September 30, 2015. F.F. Nos. 21, 23. The WCJ further found that Claimant was not physically capable of returning to work for Employer, or to any vocational setting, based on Dr. Khella's testimony regarding his most recent examination of Claimant. F.F. No. 21.

After concluding that Claimant was rendered totally disabled by the September 30, 2015 work injury, the WCJ directed that Employer pay Claimant weekly compensation from November 8, 2015, and ongoing, and pay Claimant's related medical expenses. Conclusions of Law Nos. 6, 10. Employer appealed to the Board, which affirmed. This appeal followed.[8]

## II. Issues

On appeal,[9] Employer argues that Claimant's medical evidence was incompetent and insufficient to support an award of benefits under the Act, that the WCJ erred in admitting the Steinman Report, which was inadmissible hearsay, and that the WCJ failed to issue a reasoned decision as required by Section 422(a) of the Act.

## III.  Discussion

### A. Competency of Medical Evidence

First, we address the competency and sufficiency of Claimant's medical evidence. In a workers' compensation claim petition proceeding, the claimant bears the burden of establishing all the elements necessary to support an award of benefits,

---

[8] Employer's Application for Supersedeas was denied by this Court on May 10, 2021.

[9] Our review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, or whether necessary findings of fact are supported by substantial evidence. *City of Phila. v. Workers' Comp. Appeal Bd. (Sherlock)*, 934 A.2d 156, 159 n.5 (Pa. Cmwlth. 2007).

13

including the existence of an injury and disability, and a causal relationship between the injury and the claimant's work. *Kurpiewski v. Workers' Comp. Appeal Bd. (Caretti, Inc.)*, 202 A.3d 870, 880 (Pa. Cmwlth. 2019).

The WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight. *Lindemuth v. Workers' Comp. Appeal Bd. (Strishock Coal Co.)*, 134 A.3d 111, 125 (Pa. Cmwlth. 2016). In executing his role as factfinder, the WCJ is free to accept or reject, in whole or in part, the testimony of any witness. *Id.* A WCJ's credibility determinations are due substantial deference and may only be overturned if they are "arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render [them] irrational." *Casne v. Workers' Comp. Appeal Bd. (STAT Couriers, Inc.)*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008). It is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the inquiry before this Court is whether evidence exists to support the findings actually made. *Minicozzi v. Workers' Comp. Appeal Bd. (Indus. Metal Plating, Inc.)*, 873 A.2d 25, 29 (Pa. Cmwlth. 2005).

A medical expert's testimony is incompetent if it is based on an incomplete and inaccurate medical history. *Sw. Airlines/Cambridge Integrated Serv. v. Workers' Comp. Appeal Bd. (King)*, 985 A.2d 280, 286-87 (Pa. Cmwlth. 2009). However, "[a] medical expert's opinion is not rendered incompetent unless it is *solely* based on inaccurate or false information." *Am. Contracting Enters., Inc. v. Workers' Comp. Appeal Bd. (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001) (emphasis in original). The opinion of a medical expert must be viewed *as a whole. Id.* Inaccurate information will not defeat an expert's opinion unless it is dependent on those inaccuracies. *Id.* Moreover, while an expert witness may base his opinion

14

on facts of which he has no personal knowledge, those facts must be supported by evidence of record. *Newcomer v. Workmen's Comp. Appeal Bd. (Ward Trucking Corp.)*, 692 A.2d 1062, 1066 (Pa. 1997).

Employer argues that Dr. Khella's theory of causation is premised entirely on Claimant's timeline of events, which suggests his symptoms began to manifest a few days after he received the September 30, 2015 flu vaccination. Claimant's medical records, however, demonstrate that he first sought treatment on November 2, 2015, and his symptoms began a week prior to that date. Employer contends that Dr. Khella's testimony and medical opinions are further compromised by his failure to review any of Claimant's medical records from 2015 and 2016 that relate to his condition at that time. As a result, Employer argues that Dr. Khella's testimony and opinion as to causation rely entirely on the medical history Claimant provided, which Employer characterizes as flawed and self-serving. Employer relies on *King* and *Newcomer*, which similarly concerned the competency of an expert medical opinion based on the medical history provided by a claimant.

In *King*, the claimant, Cheryl King (King), was allegedly hit by a metal jetway door in October 2005, resulting in various injuries to her head and neck. When testifying before the WCJ, King denied having been previously involved in any incidents that caused injuries to her head or neck. King's testimony during cross-examination, however, revealed that she injured her head in a bus accident a few years prior to the alleged work injury, and she admitted to another incident in which she hit her head on the door of her truck. It was further revealed that King filed several workers' compensation claims between 1992 and 1997, in which she reportedly suffered from various ailments, including headaches, blurred vision, and dizziness. While King's medical expert opined that she suffered from post-

15

concussive syndrome, he had no knowledge of her condition prior to October 2005, and he did not know if she had previously sought treatment for her symptoms.

In reviewing whether a WCJ erred in awarding King benefits, this Court noted that her medical expert rendered a diagnosis without having any personal knowledge of her medical condition prior to the alleged work-related injury. King's medical expert did not review any of her extensive medical records, which documented that King had exhibited the symptoms she related to the October 2005 incident as early as 1992. Additionally, when completing a medical questionnaire for her medical expert, King denied having suffered any prior injuries of medical problems. We concluded, therefore, that the opinion of King's medical expert was not competent to establish a causative link between the alleged work injury and King's disability, as it was based on an inaccurate and incomplete medical history and on King's own theory of causation.

*Newcomer* also concerned the competency of an expert medical opinion that was based "solely and *expressly* on the medical history provided by [the claimant, Robert Newcomer (Newcomer).]" *Newcomer*, 602 A.2d at 1063 (emphasis in original). While Newcomer received treatment for abdominal and chest injuries at the time of the work injury, he later advised his doctor that he had also been treated for a shoulder injury. Based on this medical history, Newcomer's doctor provided an expert medical opinion that linked his shoulder problems to the work injury. Our Supreme Court recognized that an expert witness may base an opinion on facts of which he has no personal knowledge; however, those facts must be supported by evidence of record. Newcomer's medical records did not support his claim that his shoulder injury was work related. Rather, they demonstrated that Newcomer received "absolutely no treatment for any shoulder problem" for more than two years

16

after the work injury. *Id.* at 1066. Because the expert opinion on causation was "based *solely* on Newcomer's representation" that he sustained a shoulder injury in the work-related accident, the Supreme Court rejected it as incompetent as a matter of law. *Id.*

Turning to the instant matter, we do not agree with Employer on the dispositive nature of *King* and *Newcomer*, as the facts are sufficiently distinguishable. Although Dr. Khella's medical opinion did rely to an extent on Claimant's recitation of his medical history, he also reviewed Claimant's laboratory records from Aria Hospital, which included blood work and a spinal fluid analysis. Dr. Khella opined that these records documented a "very high" and "really abnormal" level of spinal fluid protein, which suggested to him that Claimant's condition was caused by an inflammatory process. Khella dep. at 27. This testimony, which the WCJ accepted as credible, belies Employer's assertion that Dr. Khella failed to review any of Claimant's medical records from 2015 or 2016.

As to Claimant's allegedly flawed medical history, Claimant acknowledged that he was unclear on some details, given that he testified four years after the relevant events took place. It is worth noting that Employer has not presented any evidence – medical or otherwise – to refute Claimant's testimony that he experienced no symptoms prior to September 30, 2015. Claimant testified that he experienced weakness in his legs within a few days after receiving the flu vaccination on September 30, 2015. Although he believed he saw his primary care physician "within a week or so" of that date, Claimant's records document his first visit took place on November 2, 2015, at which time he reported his symptoms began approximately one week earlier. Claimant's dep., 2/8/19, at 16. This places Claimant's symptom onset closer to the end of October 2015. As already discussed

17

herein, Dr. Khella's opinion that Claimant's condition resulted from the September 30, 2015 flu vaccination was not *solely based* on the timeline provided by Claimant but also on his review of Claimant's medical records and the rapid advancement of Claimant's symptoms *over the course of several weeks*.

The parties do not dispute the nature of Claimant's condition or the permanency of his disability; rather, they disagree over its cause. As to that, the WCJ credited Claimant's medical testimony over Employer's. This Court need not agree with the WCJ's credibility determinations, which are due substantial deference, and we will not disturb them where we do not perceive that they were made arbitrarily or capriciously or they were so "fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render [them] irrational." *Casne*, 962 A.2d at 19.

### B. Hearsay

Next, Employer argues that the WCJ erred in admitting the Steinman Report, which Employer objected to as inadmissible hearsay. Employer also asserts that the Steinman Report renders Dr. Khella's testimony "even more incompetent[,]" as his opinion was "largely based on the Steinman [R]eport." Employer's Br. at 22-23.

Under the so-called *Walker* Rule, the use of hearsay evidence in workers' compensation matters is limited to cases where there is corroborating evidence and there is no objection on the record. *Ciarolla v. Workers' Comp. Appeal Bd. (Astrazeneca Pharms. LP)*, 239 A.2d 204, 208 (Pa. Cmwlth. 2020) (citing *Walker v. Unemployment Comp. Bd. of Rev.*, 367 A.2d 366, 370 (Pa. Cmwlth. 1976) (hearsay evidence, when admitted without objection, will be given its natural probative effect and may support a finding of the board, if corroborated by any competent evidence in the record; a finding of fact based solely on hearsay will not stand)). Hearsay is

18

defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c).

Although the Steinman Report is undeniably hearsay evidence, we see no merit to Employer's argument, as there is no indication that the WCJ relied solely on the Steinman Report when rendering his decision or that the opinions of Dr. Steinman factored into the WCJ's findings and credibility determinations, or his conclusion that Claimant's condition related to his September 30, 2015 flu vaccination. We also disagree that the March 24, 2018 Steinman Report erodes the competency of Dr. Khella's testimony and opinions. Dr. Khella, who first evaluated Claimant on January 19, 2018, acknowledged that he reviewed the Steinman Report, although he could not recall when this occurred, and he agreed with its conclusions; however, he stated that the Steinman Report did not form a basis for Claimant's course of treatment.

### C. Reasoned Decision

Finally, we address whether the WCJ issued a reasoned decision under Section 422(a) of the Act, which provides, in pertinent part, that "[a]ll parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached." 77 P.S. § 834. Further, when faced with conflicting evidence, the WCJ must adequately explain his reasons for rejecting or discrediting competent evidence. *Id.*

"[A] decision is 'reasoned' for purposes of Section 422(a) if it allows for adequate review by the [Board] without further elucidation and if it allows for

adequate review by the appellate courts under applicable review standards." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1052 (Pa. 2003). In a case where the WCJ "has had the advantage of seeing the witnesses testify and assessing their demeanor, a mere conclusion as to which witness was deemed credible . . . could be sufficient to render the decision adequately 'reasoned.'" *Id.* at 1053.

Where medical experts have testified solely by deposition, resolution of conflicting medical testimony cannot be supported by a mere statement that one expert was deemed more credible than another. *Id.* While the WCJ is the sole arbiter of credibility and evidentiary weight, he must provide an adequate basis for rejecting a witness's testimony when he does not testify live before the WCJ. *Id.* at 1052-53. "[S]ome articulation of the actual objective basis for the credibility determination must be offered for the decision to be a 'reasoned' one which facilitates effective appellate review." *Id.* at 1053.

Employer's argument that the WCJ's decision was not reasoned largely reiterates its earlier contention that the WCJ's findings were based on "entirely inaccurate evidence." Employer's Br. at 24. By way of example, Employer contends that Claimant's testimony regarding the onset of his symptoms could not be deemed credible, given that he did not seek treatment until November 2, 2015, 33 days after he received the flu vaccination. Employer also questions the WCJ's reliance on Dr. Khella's status as one of Claimant's treating physicians because he first evaluated Claimant more than two years after Claimant's symptoms arose, and the "only 'medical record'" Dr. Khella relied on in arriving at his theory of causation was the inadmissible Steinman Report. Employer's Br. at 26. Employer contends that, by way of contrast, Dr. Bennett provided a comprehensive history and review

20

of Claimant's treatment records, which gave him an accurate history of Claimant's symptoms. Dr. Cuneo likewise reviewed more records than Dr. Khella.

Employer's attack on the WCJ's decision as unreasoned is nothing more than a request for this Court to reweigh the evidence, which is not within our purview. The WCJ explained his credibility findings for each witness, including Claimant, who testified live and by deposition. Claimant presented his live testimony "in a forthright manner," although the WCJ acknowledged that Claimant "was not a historian" as to the date he received the flu vaccination. WCJ Decision, F.F. No. 20. Claimant admitted he had trouble remembering some details, given the passage of time. The WCJ nonetheless credited Claimant's testimony regarding the onset, location, and nature of his symptoms, in part because Claimant was able to perform his job duties and daily activities without restriction prior to his receipt of the September 30, 2015 flu vaccination.

As to the medical evidence presented, the WCJ thoroughly explained the reasons he favored Claimant's evidence over that introduced by Employer. Employer's contention that Dr. Khella was not one of Claimant's treatment providers is somewhat curious, given that Dr. Khella evaluated Claimant on several occasions and recommended a treatment plan of pain management and physical therapy. The fact that Dr. Khella did not examine Claimant until two years after his symptoms arose does not remove him from the realm of treating physician.

Ultimately, Employer's challenge to the WCJ's decision is grounded in its dissatisfaction with the results, which does not form a basis for relief. Accordingly, we affirm the Board.

_____
ELLEN CEISLER, Judge

21

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Home Depot USA, Inc.            :
          Petitioner      :
                                :
      v.                      : No. 113 C.D. 2021
                                :
Abdolrahi Noorani (Workers'      :
Compensation Appeal Board),      :
          Respondent      :

# **O R D E R**

AND NOW, this 23rd day of December, 2021, the January 15, 2021 order of the Workers' Compensation Appeal Board is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge